Stephen D. FULLER, Paul A. Fuller, Volney Righter, as Executor of the Last Will and Testament of Brewster Righter, deceased, and Martin Davis, Plaintiffs,

v.

Arthur DILBERT, Samuel Dilbert and Abraham Dilbert, Defendants.

Abraham DILBERT, Defendant,

v.

Arthur DILBERT and Samuel Dilbert, Co-Defendants.

United States District Court
S. D. New York.

Aug. 7, 1965.

See also D.C., 32 F.R.D. 60.

Breed, Abbott & Morgan, New York City, for plaintiffs, Thomas A. Shaw, Jr., Walter R. Shepard, New York City, of counsel.

Schwartz, Nathanson & Frank, New York City, for defendants Arthur Dilbert

and Samuel Dilbert, George H. Schwartz, Paul E. Gelbard, New York City, of counsel.

John R. Peddy, New York City, for defendant Abraham Dilbert.

WEINFELD, District Judge.

This litigation revolves about a contract for the sale of a block of unregistered stock of Dilbert's Quality Supermarkets, Inc., a corporation which had been engaged in the supermarket and food store business in the Metropolitan New York area. The litigants are (1) Arthur and Samuel Dilbert, the sellers of the stock; (2) Abraham Dilbert, their cousin, the purchaser of the stock; and (3) the partners of an investment and underwriting concern, S. D. Fuller & Co.,[1] who jointly and severally guaranteed the performance by Abraham Dilbert of the purchase contract.

Under the terms of the contract entered into on March 10, 1961, Abraham Dilbert agreed to purchase from his cousins, Arthur and Samuel, 164,540 shares of common stock, including the common stock to be obtained on conversion of preferred shares, at a price of $6 per share, for a total of $987,240. Upon execution of the contract $210,000 was paid for 35,000 shares, which were delivered on May 9, 1961. The balance of the shares as they came into the sellers' possession were to be deposited in escrow, and the purchaser was obligated to draw these down in five equal annual installments beginning on March 10, 1962, delivery to be made upon payment at the agreed price per share.

No registration statement was in effect as to the 164,540 shares, which respresented approximately twenty-seven per cent of the then outstanding stock. However, "Abraham Dilbert and his designees" agreed that the purchased shares were being acquired for investment so that the transaction would come within the exemption provision of Section 4(1) of the Securities Act of 1933.[2]

The Fullers, upon execution of the contract and as required by its terms, signed the following guaranty: "Performance of the foregoing agreement by Abraham Dilbert is hereby guaranteed." Simultaneously, the Fullers entered into a separate agreement (referred to as the designation agreement) with the purchaser under which (as permitted by the stock purchase agreement) they, the Fullers, purchased 8,500 shares of Abraham Dilbert's initial acquisition of 35,000 shares, for which they paid $51,000; in addition, they agreed to purchase fifty-five per cent of the balance of the shares that Abraham was to take down in installments.[3]

In March 1962 the sellers, upon the failure of the purchaser or the guarantors to take down and pay for the first installment, declared a default; in April 1962, by reason thereof, they claimed the entire purchase price and gave notice they intended to sue. But before the sellers instituted any action, the guarantors commenced this suit for a declaratory judgment that the contract for the sale of the stock was void and unenforceable on the grounds that the sale was not for investment, but was a public distribution in violation of Section 5 of the Securities Act of 1933,[4] and that the sellers did not own all of the stock contracted to be sold, a violation of Section 16(c) of the Securities Exchange Act of 1934.[5] The initial pleading asserted no charge of fraud or conspiracy on the part of Abraham, Arthur and Samuel Dilbert.

The role in which the litigants were eventually cast in consequence of successive amended pleadings has some significance. The purchaser, Abraham Dilbert, in answer to the guarantors' first

---

1. The partnership as such is not involved in this litigation, although the guarantors, Stephen Fuller, Paul Fuller and Martin Davis, are partners in S. D. Fuller & Co., as was Brewster Righter, whose estate appears by an executor.

2. 15 U.S.C. § 77d(1).

3. After deduction of 25,000 shares purchasable by another designee and 25,000 shares reserved for repurchase by the sellers.

4. 15 U.S.C. § 77e.

5. 15 U.S.C. § 78p(c).

amended complaint, cross-claimed against the sellers, Arthur and Samuel Dilbert, for rescission of the contract, asserting it had been induced by fraudulent representations and concealments on the part of the sellers as to the financial condition of the company. In response the sellers moved to dismiss the cross-claim and for summary judgment, contending that since Abraham was executive vice president of the company and chargeable with knowledge of its affairs and condition, the claim of fraud was sheer pretense. This motion was denied, as was a motion for summary judgment against the guarantors.[6] Thereafter, the guarantors, in a second amended complaint, adopted the purchaser's allegations of fraud and sought to void the contract on this additional ground.[7] The sellers then counterclaimed against the guarantors for breach of their guaranty and sought recovery of the balance due; they also sought recovery from the purchaser for his breach of the contract.

As the pretrial procedure moved forward, the Fullers served a fourth pleading (a third amended complaint) in which they charged, as they had not previously, that Abraham, the purchaser, had conspired with his cousins, the sellers, to defraud them, the guarantors. This fourth and final pleading by the plaintiffs in substance sets up two separate causes of action: (1) that the purchaser and sellers had conspired to induce them to execute the guaranty and designation agreements by means of fraudulent representations and concealments involving common law fraud and a failure to comply with the stricter requirements of fair dealing imposed by the Securities Exchange Act of 1934, and (2) that the purchase agreement and their guaranty of its performance are void and unenforceable as in violation of Section 5 of the Securities Act of 1933, Sections 16(c) (1) and 16(c) (2) of the Securities Exchange Act of 1934, and Section 664(7) of the New York Penal Law. The plaintiffs further, in defense to the sellers' counterclaim for the contract price, allege nonperformance by the sellers.

The issues were sharply contested in an extensive trial, during which almost 2,000 pages of testimony were taken and scores of exhibits running into hundreds of pages received in evidence. The principal litigants were witnesses upon the trial; another important witness was an attorney who had participated in the negotiations and the contract closing. Whether he represented the Fullers or Abraham Dilbert, the purchaser, or both, was a sharply controverted issue—one of some significance, since if the attorney acted for the Fuller interests, his knowledge of certain matters touching upon the fraud charges was attributable to them.

The determination of the fact issues has not been without its difficulties, principally because of the generally unsatisfactory nature of much of the testimony of the interested parties. The testimony of the guarantors with respect to a number of material matters abounded in self-contradictions and, in some respects, was in conflict with the testimony of one another. The purchaser, eventually charged by the guarantors as a conspirator together with the sellers, had himself, as already noted, sought to void the purchase agreement upon allegations of misrepresentation. Thus, to an extent, and at a time when the guarantors had leveled no fraud or conspiracy charges against him, his interests were in large measure allied with theirs—voiding of the contract would release both from their commitments. This identity of interest was abundantly manifested; it was revealed by ready and acquiescent answers to leading questions at once redounding to his as well as to the guarantors' advantage. Then, too, there were instances where the purchaser admitted the falsity of his tes-

---

6. Fuller v. Dilbert, 32 F.R.D. 60 (S.D. N.Y.1962).

7. Plaintiffs acknowledge that following denial of the sellers' motion for summary judgment they, with leave of the Court, amended "their complaint in effect to adopt Abraham Dilbert's cross-claim of fraud upon him * * *." Plaintiffs' trial memorandum, p. 10.

timony, both upon his pretrial deposition and at this trial. Finally, one of the sellers, with respect to one matter which the guarantors advance in seeking to void the agreement, had given false testimony in a bankruptcy proceeding and upon his pretrial deposition, which he acknowledged and had corrected prior to the trial.

■ Out of the welter of this type of testimony the Court has had to sift fact from fiction, truth from untruth. In the situation here presented, events, when viewed in proper perspective against the background of time, setting and circumstance, may be more revealing and shed greater light upon what actually transpired than what the witnesses say,[8] or they may give support to a witness' testimony as credible or require its rejection as unworthy of belief. The ultimate test in passing upon the credibility of the witnesses after taking into account, among other matters, the inconsistencies whether inadvertent or deliberate, the contradictions, the admitted prior falsities, is, did the witness tell the truth before this Court at the current trial?[9]

■ Based upon the Court's trial notes, which include its contemporaneous appraisal of each witness, a word by word reading and study of the stenographic transcript of the trial, the demeanor of the witnesses, an evaluation of their credibility and the reasonable inferences to be drawn from established facts and surrounding circumstances, this Court concludes that the plaintiffs have failed to establish either common law fraud or other fraudulent conduct under the Securities Exchange Act or their claim that the sellers and the purchaser engaged in a conspiracy as charged.

To set matters in proper perspective, events preceding the signing of the contract must be considered.

Dilbert's was founded in 1914 by three brothers: Louis, the father of Arthur and Samuel, the sellers; Harry, the father of Abraham, the purchaser; and Charles, a third brother. The business was originally conducted as a partnership, but was incorporated in 1925. By 1957 the enterprise consisted of a retail chain of seventeen supermarkets and twenty-two food stores in Brooklyn, Queens and Nassau County, all operated under the Dilbert name. The stock of the corporation was then held principally by Louis Dilbert, its president, who owned forty per cent; Abraham Dilbert, its executive vice president, who owned ten per cent, and one S. Solon Cohen, a son-in-law of Louis and a brother-in-law of the sellers. Cohen, in March 1956, had acquired a forty-five per cent stock interest (that of founder Charles, then deceased).

In 1957, to raise funds for a continued expansion program, the company "went public" to the extent of 180,000 shares of common stock (in units). The Fuller organization was the underwriter of this public distribution, and its senior partner, Stephen Fuller, was elected a director of Dilbert's pursuant to the terms of the underwriting agreement. In May 1960 Louis Dilbert, the last of the founders, died. Under his will, which was duly probated, he made a specific bequest to each of his sons, Arthur and Samuel, of 48,827 shares of Dilbert stock. These shares, together with others which they had acquired during their father's lifetime, are those sold under the contract here at issue.

For some time prior to the signing of the contract on March 10, 1961, the chief and dominant figure in the company was S. Solon Cohen who, in addition to being the largest single stockholder, was chairman of the board and president. Abraham Dilbert was executive vice president and a director; his cousins, Arthur and Samuel, were respectively vice president

---

8. Cf. Dyer v. MacDougall, 201 F.2d 265, 268–69 (2d Cir. 1952).

9. Cf. Young Ah Chor v. Dulles, 270 F.2d 338, 341 (9th Cir. 1959); United States v. Reina, 242 F.2d 302, 307 (2d Cir. 1957); United States v. Margolis, 138 F.2d 1002, 1004 (3d Cir. 1943). See also, 2 Wigmore, Evidence § 527 (3d. ed. 1940).

and secretary, and each was also a director. Cohen, his wife (sister of the sellers), his son and a business associate also were directors. Counsel to the corporation and Stephen Fuller completed the board.

It certainly is not open to serious challenge on this record that Cohen ran the affairs of the company, determined its policies and ruled with an iron hand. He acted as though Dilbert's were his private preserve, ignoring the other directors and executives, and withholding information from them. All were subordinate to him or acquiesced in his judgment after the event. Although there was an executive committee of three, consisting of Cohen, Abraham and Arthur Dilbert, it did not function. Cohen was abusive in his dealings with subordinates, store managers, executives and fellow directors, particularly those related to him by marriage, the sellers herein, who were cowed by him. Despite their titles as officers and directors, in fact their roles in the corporate hierarchy were not major and they functioned principally as employees.

In June and July 1960, at a board meeting and in press announcements, Cohen had painted a rosy picture of the company's prospects for that year. As it turned out, the company sustained a loss of $263,000 for the first six months, which did not come to the attention of the Fullers and other directors until October of 1960, when it was announced in a financial journal. The Fullers' requests for details as to the unanticipated loss were ignored by Cohen, nowithstanding that apart from Stephen Fuller's right as a director to information, they were entitled to receive, under the underwriting agreement, complete certified annual audits, noncertified semi-annual earning statements, and advice as to monthly sales of groceries, meats and produce. This was a familiar pattern, since previous requests for reports and monthly figures had consistently been disregarded by Cohen as far back as 1958—as Stephen Fuller himself phrased it, he got the "brushoff," and the little information which occasionally he received orally was "very unsatisfactory." The other directors were similarly treated.

Entirely apart from the first half 1960 loss, Cohen's actions and conduct had caused serious concern about the company's future. In 1959 and 1960, without consultation with fellow directors, he made a number of significant moves that were ill-timed and ill-advised. By the fall of 1960, the Fullers had given up asking Cohen for reports; they had not only become "disenchanted" with, but had developed a violent distaste for, him, both as an individual and as manager of the business. They were dissatisfied with the general state of the company and recognized its salvation was to get rid of Cohen. Abraham Dilbert was of similar mind and led the movement to oust Cohen. The Fullers cast their lot with Abraham soon after they learned of the first half loss. Abraham, with Fuller support, urged Arthur and Samuel to pool their stock to force the issue. They declined because of family relationship and because they had no stomach for a proxy fight, notwithstanding Cohen's browbeating and ill-mannered treatment of them. Nor, during this period, although solicited to do so, were Arthur and Samuel willing to sell their stock.

The breakthrough came late in February 1961, when Arthur and Samuel manifested readiness to sell the stock inherited under their father's will, motivated by the need for cash to pay their share of the estate taxes, the illness of one of them, and because they no longer could take Cohen's abuse. Abraham Dilbert acquainted the Fullers with the turn of events, and they agreed the acquisition of this large block of stock afforded a real opportunity to rid the company of Cohen. The sellers, from the start aware that Abraham himself lacked the means to pay for so large a block of stock, insisted that any purchase by him had to be underwritten by a responsible guarantor.

Negotiations commenced in earnest on March 1 with an initial session participated in by Martin Davis, a Fuller part-

ner, Abraham, the purchaser, and Arthur, one of the sellers. Then followed conferences and telephone calls between and among interested parties. Late Friday evening, March 10, after an extended conference, the agreement now under attack with its appended guaranty was concluded and signed by all parties.

On Monday, March 13, Cohen announced at a special board meeting that the first half losses had grown to over $500,000 for the nine-month period of 1960, but assured the directors that the "preliminary indications were that the losses had been stopped as of the last quarter of the last fiscal year." This information did not deter the Fullers and Abraham Dilbert from their campaign to oust Cohen; rather, it intensified their efforts. They continued to marshal the stock of their friends and associates and purchased additional shares on their own account and for friendly interests.

On May 5 the Fullers learned that the loss for the entire fiscal year 1960 was over one million dollars. A special board meeting was held on May 8, which Cohen did not attend, at which the 1960 figures were officially announced. With the Fuller group seemingly in control, Abraham Dilbert was named as "acting Principal Executive Officer." The meeting was recessed to May 15, when the Cohen forces, then having a majority of the board, made a brief comeback and passed a series of resolutions aimed at entrenching themselves and solidifying their position for the prospective proxy showdown at the annual stockholders' meeting scheduled for June.

But Cohen soon gave up the ghost without a fight—after Stephen Fuller sent word to him that his group had the necessary votes to oust him. A special meeting was held on May 25, at which Cohen formally resigned as chairman of the board and president; his associates also resigned as directors and officers; Abraham Dilbert was elected to succeed Cohen; the resolutions of May 15 were rescinded and the annual meeting of stockholders was set for June. At that meeting the Fuller slate of directors, including two Fuller partners, was elected. Irrevocable proxies, which had been executed and delivered upon the contract closing by the sellers covering all the shares of stock owned by them beneficially and of record, were voted by the purchaser in favor of the slate.

Thus, the Fullers and Abraham Dilbert achieved their objective of ridding the company of Cohen and taking over its management. But the losses had continued, running to $448,000 for the first five months ending June 3, 1961, by which date the Fuller group was in control.

The record is silent until March 1962 when, upon the failure of the purchaser to take down and pay for the first installment of shares and the guarantors' failure to make good, the sellers declared a default.

The guarantors' charges of conspiratorial conduct by the purchaser and the sellers upon which they predicate their refusal to honor their guaranty fall into two broad categories: (1) affirmative misrepresentations, and (2) concealment of material facts. While the spread of plaintiffs' claims of affirmative misrepresentations was broad, their thrust centered about the financial condition of the company for the second half of 1960. Stephen Fuller testified that when, in November 1960, he learned of the first half loss of $263,000, he sought, but as in the past was unable to obtain, satisfactory information from Cohen; that he then directed his inquiry to Arthur Dilbert, who stated the losses were of a nonrecurring nature and there was nothing to worry about since the fourth quarter was the best; that again in January and February 1961 he called Arthur (after he was unable to contact Cohen), who assured him the company had "a wonderful fourth quarter," with profits sufficient to overcome the first half loss; that the company was "sound" and operating "in the black." These statements, it should be noted, allegedly were made not only prior to the contract negotiation period, but also before the plaintiffs knew of the Dilberts' willingness to sell their stock, which the plaintiffs fix as March 1.

Coming closer to the contract date, Martin Davis, a Fuller partner who at the initial conference on March 1 had negotiated the $6 per share price, testified that Arthur Dilbert made similar statements about the company operating in the black and also that the stock was worth more than $9, the then market price.

Stephen Fuller testified that the following day, March 2, Arthur said he knew the company was "sound," "in the black," and that the second half was "profitable." A third Fuller partner, Paul Fuller, claimed that on March 4 Arthur, and Samuel too, gave assurances that the first half loss was nonrecurring; that the company was in the black and making a profit for the second half, and that as soon as Cohen was out "the company could take off because they were in a good financial condition."

Yet there are patent ambiguities in their respective versions. Stephen Fuller also testified that Arthur said he "hoped" that the company had made a profit in the second half; that he "believe[d]" it was sufficient to wipe out the first half loss; that it "might have" made a profit for the whole year; and also that he didn't know whether the company "would" make a profit sufficient to make up for the $263,000 loss. Moreover, he conceded that Arthur had reminded him that the third quarter was always the "lowest."

Martin Davis' version of Arthur's statements of the company's financial condition ranged from it "would" or "should" to it "was operating" in the black. He admitted that when the contract was made, he recognized the possibility of the company's suffering a loss for the year. Davis also conceded that Arthur's alleged estimate of the value of the shares above the $9 market price was an expression of opinion to which he, Davis, paid no attention since he did not consider Arthur an expert.

Paul Fuller, whose testimony as to alleged representations has also been referred to, testified that Arthur said "in all probability they would show a profit."

The sellers deny making the alleged representations either in haec verba or in substance, although they do not dispute there was general discussion of the deteriorated state of the business, the poor morale, and other adverse conditions due to Cohen's actions and conduct.

Abraham Dilbert conceded upon the trial that his cross-claim charges of fraudulent representation by the sellers as to the financial condition of the company were false and that no fraud had entered into the stock purchase.

■ The Court finds that no actionable representations were made as to the company's financial condition, its status, its profits, its sales or the value of the stock. Abundant evidence, much of it circumstantial, compels this finding, as well as a further finding that the plaintiffs also have failed to sustain the claim of concealment of material facts, whether based upon common law fraud or the stricter requirements of the Securities Exchange Act. The claims are negated by events which preceded and led to the stock purchase agreement and by the subsequent acts and conduct of the Fuller partners.

As to affirmative representations for the second half of 1960 and thereafter, those Fuller partners who testified they asked Arthur for the figures upon which his statements were based, conceded he told them that he did not have any and also that to their knowledge they were not then available—indeed, it is beyond dispute the figures had not been finalized until after the contract date. These circumstances, taken together with the fact that plaintiffs had been denied the information by the key source, Cohen, who similarly had refused it to the sellers, cast substantial doubt upon their testimony that they asked Arthur for what they knew was unavailable. The Fullers, if interested, were, as underwriter-directors, in a more powerful position than Arthur to compel production of pertinent material.

But over and beyond this, the second half figures were not then of material

significance. What was of prime concern to the Fullers and Abraham Dilbert was the opportunity to obtain the sellers' stock, without which Cohen could not be dislodged. It was following the disclosure of the first half loss, contrary to Cohen's optimistic forecast and because of his refusal to give the guarantors information, that the guarantors, aware that the third quarter was historically the poorest and that the company was headed for disaster unless Cohen were removed, decided to join forces with Abraham Dilbert in the effort to wrest control from Cohen. This required either the necessary stock or votes. Until March 1, the sellers, whose stock was crucial for their purposes, were unwilling to sell or to vote their stock against Cohen. The acquisition of the voting strength was all important to the Fullers and Abraham Dilbert. It mattered not whether the necessary shares to achieve their purpose were bought from the sellers or from unknown stockholders in the open market. Indeed, on March 6, four days before the contract was signed, while negotiations were in progress, plaintiffs had already embarked upon their campaign to marshal voting power when they exercised warrant rights and acquired 33,828 shares of common stock (voting stock) at an expenditure of $118,398.

In view of plaintiffs' dominant purpose and their position as underwriters and directors, the claim of affirmative representations as to the company's financial condition, second half profits, the wiping out of losses and the like, as inducing them to enter into the guaranty and the stock purchase under the designation agreement, fails.

Finally, if, in fact, any oral representations had been made, it taxes credulity to believe that the plaintiffs—sophisticated, seasoned investment bankers, who had never in all their underwriting experience closed a transaction without written warranties and representations, even one involving a sum considerably less than the million dollar commitment which they undertook by the guaranty—would not have required the inclusion of the representations in the agreements or in other appropriate form. Had the claimed or any representations been made, failure to specify and reduce them to writing is all the more incredible in the light of Davis' testimony that between the opening of negotiations on March 1 and the signing of the contract on March 10 the Fullers tried to get weekly and monthly sales figures, but were thwarted by Cohen.

Their claim of concealment and omission to state material facts necessary in order to make statements not misleading, with the exception of one item hereafter considered, likewise is without persuasive evidential support. These charges, in broad terms, relate to the financial condition of the company, continuing operating losses, general deterioration and mismanagement.

The claim as to the financial condition of the corporation and continued operating losses is an elaboration of the charge of affirmative misrepresentation. The plaintiffs were aware of the first half loss by late October 1960; as already noted, it was one of the factors which determined their participation in the movement to oust Cohen. Hence, in effect, their charge is that thereafter and prior to the contract closing the defendants knew but omitted to state and concealed from the plaintiffs that further losses had been sustained in the second half, which continued into 1961, and that the trend of the company's business was downward; that its financial condition was poor, and that "a very heavy loss was in the offing—the worst in the industry."

With respect to the company's financial condition, its operations, earnings, profits, losses, net worth and other significant data, the plaintiffs received the same reports when issued as the other directors, and no sooner. The record does not support their claim that the defendants knew any more about these matters than the plaintiffs or in advance of them. True, the defendants were employed by the company, but this gave them no greater knowledge of basic finan-

cial data, operating figures or the condition of the business than any other board member or executive.[10] Arthur and Samuel were conditioned by Cohen through humiliating experiences not to ask for figures, and when on occasion they covertly sought information about the company's status from the treasurer it was to no avail, since the latter was under Cohen's instructions not to make any statements. Whatever concealment was practiced was by Cohen, and those imposed upon included not only the plaintiffs but the sellers. Plaintiffs, no less than the defendants, in the period from October 1960 to March 10, 1961, knew by reason of Cohen's activities that the company's future was dismal so long as he ran it. There is no evidence that anyone knew that the company was too far gone to be saved, nor is there proof that this was so.

The guarantors also claim concealment of the fact that the company was being grossly mismanaged; that it had undergone serious and progressive deterioration; that its employee morale was low and that its standing in the industry was on the decline. Here they rely in large measure upon a document prepared by Abraham Dilbert in the spring of 1961, which he entitled "Gross Irregularities in Company Management," reflecting his opinion as to the factors, principally Cohen's acts and conduct, which accounted for and contributed to the company's deterioration. Many are his ruminations—a hindsight analysis. This document has no more probative value [11] than an indictment, to which it was likened during the trial. That Abraham committed his thoughts to paper does not establish them as facts, although as to a number plaintiffs have assumed their verity without proof.

In any event, these charges of omission to state facts as to mismanagement and deterioration of the company are without substance; the facts were known to the plaintiffs and in large measure led them to join forces with Abraham in the effort to oust Cohen. Indeed, as their own testimony indicates, both Stephen Fuller and Martin Davis could well have prepared a similar bill of indictment. The fact is that for a substantial period prior to the purchase agreement all the parties—the guarantors, the purchaser and the sellers—knew that the company's affairs were in a mess; that Dilbert's was being grossly mismanaged under Cohen, whose activities were rapidly running it into the ground, and who bullied employees, rode roughshod over directors, officers, executives, and denied them full financial and other information. These conditions certainly reflected a general state of deterioration, mismanagement, low employee morale, arbitrary and capricious conduct and a waste of corporate assets.

Apart from knowledge independently acquired by the guarantors, the testimony abundantly establishes that during the contract negotiation period many of the material matters they claim were concealed from them, and which should have been disclosed,[12] were openly and freely discussed. When, for example, Abraham on March 1 informed the Fullers of the sellers' readiness to sell their stock, to stress the importance of the opportunity to get rid of Cohen, he emphasized the condition of the corporation and the low state of its employees' morale; that it was being ruined by Cohen's activities.

On March 8 a negotiating and contract drafting conference was held, attended by the sellers, their attorney and the purchaser. Participating in the conference was an attorney, one Mermelstein, and his associate. The Fullers were not present. At that conference

---

10. While there were periodic reports made available to executives and even store managers, these in no way indicated the net operating profit of the business.

11. Except insofar as it may be deemed to contain admissions by Abraham, binding only upon him since the Court finds no conspiracy.

12. A number that were alleged have no evidential support.

Abraham Dilbert reviewed the plight of the company. He stated it was in poor financial condition; that it had sustained net operating losses for the year 1960; that it was losing money heavily. He noted in unmistakable terms the downward trend of the company and its deteriorated state. While no figures as to 1960 and early 1961 were then available, he left no doubt that the losses were substantial. Since these statements were made in Mermelstein's presence, the issue of whether he represented the Fullers must be resolved.

■■ The Court, after a most careful scanning of the record which reveals substantial contradictions and inconsistencies by all who testified on this issue and some rather vague explanations, and mindful of the import of its determination, finds that Mermelstein represented the guarantors, as well as the purchaser, in the stock purchase negotiations and the contract closing. He had represented the Fullers in the original Dilbert public financing and in a number of other underwritings. From the end of January 1961 the Fullers dealt directly with him and not with his firm, to which he had become counsel. When the negotiations leading to the agreement commenced he conferred not only with Abraham Dilbert, but also with the Fullers. Although on the summary judgment motion the flat statement was made that Mermelstein indeed was the Fullers' attorney and represented them in the transaction—a matter of significance there as it is here—no denial was then made by the Fullers, although in a reply affidavit they did controvert other matters. Whether or not there was a formal retainer for the specific negotiations and contract, a general attorney-client relationship existed between the Fullers and Mermelstein, which still continued during the period in question. Moreover, there is ample evidence that the Fullers relied upon Mermelstein's presence at the closing and that in fact he there gave them legal advice. If Mermelstein was not their attorney in the transaction, the Fullers would have been entirely without legal

representation, since no other attorney then represented them. It challenges belief that the experienced and worldly underwriters who, whether in a guarantor or purchaser capacity, were committing themselves to an obligation of close to a million dollars, would, particularly in the light of their own policy of always requiring written warranties, do so without legal representation. The fact that one Fuller partner went to the contract closing on March 10 believing that he and his partners were to be the direct and only purchasers of all the stock and not the guarantors of a stock purchase, makes it even more questionable that the transaction was consummated without legal representation. Since the attorney did represent the plaintiffs, they are chargeable with the facts disclosed at the March 8 conference which, alone and without regard to any other circumstance, in very large measure destroys their claim of concealment.

The Fullers continued to receive information. On March 10, at the contract closing, Abraham Dilbert, in urging upon the three Fuller partners who attended the necessity for quick action in getting Cohen out before the business was completely ruined, elaborated upon and detailed many of the serious things that Cohen had done which had brought the company to its low state, and the Fullers themselves recounted other incidents of Cohen's conduct.

But apart from whatever was said or not said up to and through March 10, 1961, the fraud charges are rebutted by the subsequent conduct of the guarantors. The facts which they claim were misrepresented and concealed prior to March 10 were discovered by plaintiffs between March 13 and May 5, 1961. Certainly they were known to them by the time of the default in March 1962. Their actions within this period are inconsistent with their having been misled by the sellers.

First, on Monday morning, March 13, a little over forty-eight hours after the contract had been signed, the Fullers learned that the losses had continued

through the third quarter of 1960, bringing the loss for the first nine months to over $500,000. They made no attempt to stop payment on their uncashed checks or to rescind the agreement. Indeed, no accusation or charge was made against the sellers. On the contrary, thereafter, in cooperation with the purchaser, they pursued their campaign through March and April to increase their voting power.

Second, on April 24 the Fullers and the purchaser consented to the acceleration of the delivery of the first 35,000 shares purchased under the contract. They then also agreed: "In all respects the said agreement dated March 10, 1961 shall remain in full force and effect." [13]

Third, on May 5 the Fullers learned unofficially, and on May 8, officially, that the 1960 loss was in excess of one million dollars. Yet they continued their quest for control without in any respect repudiating their guarantee or purchase agreement. And on May 9, the accelerated date on which the sellers delivered the initial installment of 35,000 shares, the Fullers accepted their portion, 8,500 shares.

Fourth, later, in June 1961, the stock purchased from the sellers was voted to enable their group to gain control of the corporation and its management and to elect Abraham as president and Arthur and Samuel to the executive committee. And still no accusations of fraud or concealment were made against Arthur or Samuel, although they were leveled against Cohen.

Fifth, after they and the investing public knew of the million dollar loss for the year 1960, the guarantors bought and sold shares for 9⅞ and notwithstanding the loss, they considered the stock then—in mid May 1961—worth the price, which would seem at once to put to rest any claim of misrepresentation of the value of the stock.

The explanation by the guarantors—that although aware the claimed representations were false they did not disavow the agreement and thereafter took so many steps inconsistent with their fraud charges simply because the sellers reassured them—has a hollow ring, particularly so since Davis testified that after March 13, 1961 the Fullers no longer accepted the sellers' word for anything.

Certain significant events also occurred in March and April 1962, by which time the guarantors had knowledge of all matters upon which they predicate their claim. In early March the guarantors and the purchaser offered to take down the March 10, 1962 installment of shares if part of the amount due thereon was deferred. The guarantors went beyond this and offered to take down the next four annual installments of stock at once if a price adjustment were granted. No claim was then made of any legal defense to the contract. Moreover, on April 19, after the sellers had declared a default and claimed the entire balance of the purchase price under the acceleration clause, the guarantors made funds available to the purchaser to enable him to tender payment of $155,448 plus interest to take down the first past due installment of shares, whereby he sought reinstatement of the contract.

The Court is unpersuaded that the guarantors would have acted as they did after March 10, 1961 had they been misled as they now claim. They continued in control of the company until bankruptcy intervened in November 1962. The record does not indicate, and there is no basis upon which to conclude, whether the bankruptcy was a legacy of the Cohen era or rather the result of subsequent mismanagement when the Fuller interests were in control and Abraham was chief executive.

One matter touching upon the concealment charges has been reserved—that of the cash discounts or, as plaintiffs describe them, "kickbacks." The subject was raised in April 1962 at a conference attended by the parties and attorneys

---

13. The amendment was not delivered to the sellers until May 9.

after the sellers had declared the purchasers and guarantors in default. A Fuller partner or Mermelstein [14] mentioned that it had come to their attention that cash discounts, properly the corporation's, had been received by Arthur, but this was denied on behalf of the latter who subsequently, in a bankruptcy examination and also in his pretrial deposition, made similar denials. However, before signing the pretrial deposition, he corrected it and admitted the falsity of his prior testimony. He then, and upon the trial, acknowledged that he had received discounts from suppliers, first by check and later in cash. This originated, according to him, following a cut in his salary of $2,500 per year, at which time reduction in salaries of others was contemplated. His business and entertainment expenses, however, continued and Cohen, in an effort to avoid interference with the salary reduction plan directed that Arthur reimburse himself for such expenses by applying $225 per month out of the discounts, which he did and turned the excess over to Cohen, which the latter used for cash business requirements. Arthur also testified that beginning in April 1958, at Cohen's direction, he delivered to Abraham Dilbert cash at the rate of $4,500 per year, which Cohen had made available out of the discount moneys to compensate for deductions from Abraham's salary checks. The practice was discontinued in the spring of 1961 at the time Cohen was on his way out when, at Abraham's direction, the discounts were thereafter directly allowed or deducted from bills of suppliers.

Whatever view one may take of this practice, the issue is whether, under the circumstances of this case, the failure to disclose it to plaintiffs voids their guaranty and designation agreement. The plaintiffs contend that the discounts, taken together with loans which were obtained from suppliers, one to Arthur in 1959 of $10,000 in connection with the purchase of a home, which he repaid within a month, and another to Cohen in 1957 in the sum of $100,000, were a diversion of corporate funds which contributed not only to the company's losses, but also to the progressive deterioration of employee morale and of the company's competitive position in the industry. The plaintiffs claim these matters were not known to them, and had they been disclosed, they would not have entered into the agreements. Abraham also seeks to be relieved of his commitment on similar grounds.

■ The Court concludes that in the circumstances of this case disclosure of the cash discount and loan situation (even assuming they were without knowledge, as they claim) would not have deterred them from entering into the agreements.[15] The one fact that will not down on this record is that the stock of Arthur and Samuel was vital to the Fullers' and Abraham's plan to oust Cohen and install a new management. Its acquisition was essential to their success in the looming proxy contest. The purchase was not for investment in the ordinary sense, but to salvage an investment already made. Once acquired, the control-conferring stock would and in fact did give them the effective means of forcing Cohen's resignation without a proxy fight. Considering the absolute necessity of the Dilbert stock for success in a proxy fight, it mattered not whether the sellers embodied the virtues of the Angel Gabriel or the vices of the devil incarnate—all that mattered was to obtain the control stock. There was no

---

14. Mermelstein's role at this April 1962 conference is not altogether clear. One Fuller partner testified that the attorney, although not acting as attorney, served as the "spokesman" for the entire group, which included the Fullers, the guarantors and the purchaser, Abraham Dilbert, who was there represented by an attorney. Mermelstein testified he did not represent any of the parties; that he was there as one of the escrow agents and "trying to be a good Samaritan * * *."

15. List v. Fashion Park, Inc., 340 F.2d 457, 463–64 (2d Cir. 1965) is precisely in point.

contractual commitment to continue the sellers as officers or employees of the company.

The disclosure of one more instance of mismanagement among the many others of which the plaintiffs had knowledge would not have deterred the Fullers from their prime objective to establish a new regime in the effort to save the company, to protect their already substantial investment, and to preserve their prestige as underwriters of stock for public sale. They would not have been influenced to act differently than they did if all the facts touching upon the cash discount and loan situation had been disclosed.

Moreover, the evidence establishes that the plaintiffs were not entirely without knowledge of alleged nondisclosed matters. Stephen Fuller and Martin Davis, as far back as the late fall of 1960, discussed Cohen's involvement in milk refunds or discounts; at the March 1 initial negotiating conference Davis announced he suspected Cohen of wrongdoing in connection with those refunds. Martin Davis, at that same conference— ten days before the contract closing— said he knew that Cohen had been borrowing money from the suppliers; also, significantly, Abraham Dilbert had told him that, to finance his share of the stock purchase, he, Abraham, "could borrow it from the suppliers, if necessary, the same way Cohen had borrowed from suppliers." These matters did not deter the Fullers from entering into the March 10 agreements. A plausible explanation for their readiness to do so, despite their knowledge and suspicions, is that upon the installation of the new management the discount situation would end, as it did, and the funds would be paid directly to the company in accordance with the normal business practice; further, suit against Cohen and other alleged recreant officers for breach of fiduciary duty en-

compassing all claims of wrongdoing was not an unlikely prospect.

The evidence also supports a finding that in the latter part of April or early May 1961, during the proxy campaign, Stephen Fuller, in the presence of the attorney for the corporation and others, in discussing efforts to force Cohen's resignation without a proxy fight, mentioned as a factor that he knew Cohen had been receiving cash discounts from suppliers. In addition, the Fullers, in February 1962, again acquired general information of the discounts. This and their prior intelligence of loans and discounts were included in the sum of their knowledge of all other matters now pressed to void the contract when in April 1962 they, the Fullers, put the purchaser in the necessary funds to make the tender referred to above in the attempt to reinstate the contract, after the sellers had declared the Fullers, as well as Abraham, in default and the entire balance due.

The record satisfies that with respect to their cash discount, kickback and loan claims the Fullers (and Abraham) had knowledge of substantial and material matters relating thereto; and even if in fact they were entirely ignorant, as they claim, nonetheless in the circumstances here disclosed they still would have entered into their respective agreements to acquire the stock.

In sum, upon the entire record, the conclusion is compelled that the guarantors, having made what turned out to be a bad investment, are now seeking to avoid their obligation. The record fails to sustain their charge of conspiracy and fraud,[16] and Abraham's cross-claim charges of fraud to void his agreement are entirely groundless.

We next turn to the other defenses whereby the guarantors and, in part, the purchaser seek to be relieved of their respective obligations. These fall into five broad categories.

---

16. This disposition necessarily requires that the motion to strike all evidence un-

der the conspiracy count, which was received subject to connection, be granted.

## A. Violation of Section 5 of the Securities Act.

The Fullers contend that the stock purchase agreement of March 10, 1961 and their guaranty of its provisions involved a transaction that was a public offering or distribution of unregistered stock in violation of Section 5 of the Securities Act of 1933, and consequently they are entitled under Section 12(1) of the Act [17] to have them declared void and unenforceable.

All parties were aware that the purchaser, the primary obligor under the stock purchase agreement, could not himself finance the transaction. Thus, although obligated for the entire purchase price, it was contemplated that he could designate other investors, described as designees, to take and hold portions of the stock. The Fullers were "designees" and, as already noted, purchased 8,500 shares of the initial 35,000 acquired by Abraham Dilbert. Contemporaneously, they also committed themselves under their separate designation agreement with Abraham to purchase fifty-five per cent of the installment shares as they were taken down by Abraham. Another designee was the North River Securities Company, an investment concern which, simultaneously with the contract closing, purchased from Abraham 8,000 shares of the initial 35,000.

Paragraph 8 of the stock purchase agreement provides that:

"Abraham Dilbert and his designees agree that the shares purchased hereunder are being acquired for investment and that appropriate letters of investment, as required by the attorneys for the seller, will be given by Abraham Dilbert and/or his designees, so that the sale herein made shall be deemed to be exempt from the Securities Act of 1933 * * * in accordance with the provisions of Section 4(1)."

On its face, the agreement was within Section 4(1),[18] which exempts from registration transactions not involving a public distribution. Also, it is clear from paragraph 8 that, while the purchaser could designate others to take a portion of the stock, compliance therewith required this be done consistently with its purpose that no public offering or distribution be effected, and that he and his designees would take the stock only for investment so that the exemption under the Act would be preserved.

Notwithstanding, the Fullers, and Abraham too, contend that the distribution to Abraham and to his designees, and a sale of shares to one Sol Davis, hereafter considered, constituted a public offering. Their contention must be rejected. Certainly the purchaser, who was the executive vice president and a director of Dilbert's, the Fullers and the North River Securities Company, the only offerees known to the sellers—and the Court so finds—satisfied the statutory requirements as interpreted by the courts.[19] They were few in number, of considerable financial sophistication and had access, or an easily enforceable right of access, to the kind of information which registration would disclose. In short, they were able to fend for themselves. Moreover, the purchaser and the two designees had the requisite investment intent and all were aware of the obligation that the stock was to be held for investment.[20]

---

17. 15 U.S.C. § 77l(1).

18. 15 U.S.C. § 77d(1).

19. SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

20. Stephen D. Fuller, an investment banker since 1931 and admittedly familiar with the law concerning private offerings, testified that he and his partners took for investment, and everything he saw and heard in March 1961 indicated a similar intent upon the part of Abraham Dilbert and North River Securities, and that when the Fullers sold unregistered Dilbert stock in 1962 and 1963 it was after a "change in circumstances."

The further contention of the Fullers that, notwithstanding one was a director, they were within the category of those who did not have access to the kind of information a registration statement would have disclosed—on the theory that had one been filed it would have contained material matters allegedly concealed by the sellers and the purchaser—necessarily fails in view of the Court's finding on the fraud and concealment charges.

They also seek to vitiate the agreement by reason of a sale of 3,500 shares on March 10, 1961 by Abraham Dilbert to one Sol Davis, then in Miami, Florida, who immediately cut in two friends for forty per cent of the stock and thereafter sold the balance at a profit through the facilities of the American Stock Exchange.[21] The offer appears to have preceded the actual signing of the contract. The Court finds that the Davis transaction was unknown to and concealed from the sellers by the purchaser. It was not only a breach of his express commitment that he and his designees would hold the stock for investment, but also a violation of Section 5. Thus, the question is posed whether in consequence the contract is unenforceable. The legislative purpose of the securities acts was the protection of innocent purchasers of securities, and public policy does not command that every violation of the acts renders contracts void and unenforceable.[22]

The Court accepts the view urged by the Securities and Exchange Commission in its amicus curiae brief submitted in this matter on the motion for summary judgment before Judge Dawson[23] that no public interest is served or protected by depriving the sellers of their rights under the contract—in short, that Abraham Dilbert, who undertook that he and his designees would not violate the statute, and the Fullers, who guaranteed performance of his undertaking, are not among those entitled to take advantage of an alleged Section 5 violation resulting from Abraham's distribution of stock in breach of his covenant.

Section 12 of the Securities Act which creates civil liability on the part of one who sells stock in violation of Section 5 does not require that a purchaser and his guarantor be permitted to escape their contractual obligations where the violation is brought about by the purchaser's wrongdoing in which the seller did not participate and of which he was without knowledge. No public interest requires this result. To so hold would supply a built-in defense to a purchaser, who by the very violation of his agreement would at once effectively relieve himself of all his other obligations thereunder. It would virtually destroy the utility of the private offering since any purchaser of investment stock could insure himself against the future by the simple expedient of offering or selling a small slice of his purchase to the public in violation of the Act, thus enabling him unfairly to get rid of an unfavorable agreement. On the other hand, as the Commission pointed out, permitting the sellers to enforce the contract "would establish the salutary precedent of enabling those who sell securities to enforce under-

---

21. Sellers objected to Abraham Dilbert's testimony of his telephonic offer to Sol Davis and to Davis' testimony of his subsequent offer to Irving Simon and William Zuckerberg and of the eventual sale to the public, all on the ground of hearsay, since the sellers were not present when these events took place. The short answer is that the evidence was not hearsay since the out-of-court statements were not offered to prove the truth of the matter asserted, but that the statements had been made and the sales accomplished. See 6 Wigmore, Evidence §

1770 (3d ed. 1940). Moreover, Davis' own testimony of his transaction with Abraham Dilbert was admissible under any theory.

22. Frost & Co. v. Coeur D'Alene Mines Corp., 312 U.S. 38, 43, 61 S.Ct. 414, 85 L.Ed. 500 (1941); Bankers Life and Cas. Co. v. Bellanca Corp., 288 F.2d 784 (7th Cir.), cert. denied, 368 U.S. 827, 82 S.Ct. 47, 7 L.Ed.2d 31 (1961); Wood v. Reznik, 248 F.2d 549 (7th Cir. 1957).

23. Fuller v. Dilbert, 32 F.R.D. 60, 64 (S. D.N.Y.1962).

takings to hold for investment." This is not to say that members of the investing public in whose hands the stock eventually comes to rest may not resort to Section 12. The only question before the Court is whether a purchaser of unregistered stock, who is capable of fending for himself and who contracts that he and his designees (known to be few, financially knowledgeable and to have the requisite investment intent) are taking for investment purposes only, may rescind the stock purchase because of his own then undisclosed breach of contractual duty. Abraham Dilbert may be held to his undertaking to hold for investment, and the Fullers to their guarantee of that undertaking. Nothing in Kaiser-Frazer Corp. v. Otis & Co.[24] is to the contrary, for the Court there found that the original purchase agreement "was but the initial step in the public offering of the securities which would necessarily follow." Here there is no basis for any finding that the initial undertaking to hold for investment was designed to circumvent the registration requirements of the Act. Here there is no reason why the original agreements should not be enforced; there are persuasive reasons why they should.

This disposition makes it unnecessary to consider the sellers' contention that in any event the absence of jurisdictional means, the statute of limitations, intrastate exemption, waiver and estoppel require rejection of plaintiffs' attack upon their agreements.

B. Violation of Section 16(c) (1).

From the outset Abraham Dilbert and the Fullers have contended that the transaction on March 10, 1961 violated Section 16(c) (1) of the Securities Exchange Act of 1934,[25] which makes it unlawful for an officer or director of a company to sell its non-exempt equity securities if he "does not own the security sold," and that it violated a similar provision, Section 664(7) of New York's Penal Law, proscribing sales or agreements to sell by an officer or director "unless at the time of such sale or agreement he is an actual owner of such share." The basis for this contention is their claim that at the time of the agreement, 115,694 of the shares contracted to be sold were not owned by Arthur and Samuel Dilbert, since 97,654 shares were still in the estate of their late father, and 18,040 shares represented common stock available to the sellers only upon conversion of their respective 451 preferred shares.

With respect to the estate stock, the guarantors and purchaser contend that on the contract date the sellers did not "own" the bequeathed shares because they were subject to defeasance, and rely upon the circumstance that for a variety of purposes "ownership" was in three executors (who included Arthur and Samuel); that the specific legacies to Arthur and Samuel were conditioned on their paying some $250,000, their pro rata share of the estate taxes, which sum they then did not have; that the entire estate was subject to creditors' and other claims superior to the legacies; and that the sellers' lack of ownership is indicated by their failure to report ownership under Section 16(a).[26] In light of the fact that Arthur and Samuel were specific legatees of the stock, that the claims of creditors were negligible compared with the assets in the estate, that the asserted claims of their mother and of Sherman Chassen (filed after the contract date) were insubstantial and withdrawn within a month, that the proceeds of the stock sale was itself ample to provide for the taxes due, and that the final Federal and state estate taxes were paid, with each seller having paid his proportionate share of the taxes, the Court holds that the sellers "owned" the bequeathed stock within the purposes of the two statutes involved. They had a substantial property interest therein, sufficient for the purposes of entering into the contract of sale; no particular form of legal or equitable title is required to satisfy the re-

---

24. 195 F.2d 838, 844 (2d Cir.), cert. denied, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952).

25. 15 U.S.C. § 78p(c) (1).

26. 15 U.S.C. § 78p(a).

quirements of Section 16(c) (1).[27] This was the position of the Securities and Exchange Commission on the motion for summary judgment and accords with the purpose of Section 16(c) (1) to prevent misuse of inside information by corporate directors and officers. In advancing their own rigid construction of "ownership" the guarantors and the purchaser would "make a fortress out of the dictionary," failing "to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." [28] In short, nothing in the statutory design suggests that this transaction was or ought to be treated as a "short sale."

 The conclusion reached as to the nature of the sellers' interest in the legacy shares and its sufficiency to satisfy the ownership requirements of Section 16(c) (1) is not defeated because of their failure to list themselves as owners of the shares in reports required to be filed under Section 16(a), particularly so in view of Rule 16a-4.[29] Under the Rule, when the contract was signed the executors still had two months within which to file a report. Moreover, whether the executors or the sellers omitted to file required Form 4 reports, there is no basis for the sanctions urged by the guarantors, whatever other means may be provided for by law to secure enforcement of Section 16(a). The inference which the guarantors would have the Court draw—that the sellers' failure to file as individuals claiming ownership of the stock indicates they did not acquire the stock they sold—is repelled by the Court's finding to the contrary. The further suggestion that the nonfiling constituted a violation of Section 16(a), for which the sellers should be punished by voiding the stock purchase contract, must also be rejected. Such a penalty is not called for by a failure which has not been shown to be other than inadvertent and from which no harm ensued.

 With respect to the common stock obtainable upon conversion of the preferred, the claim is nothing short of frivolous. The stock purchase agreement recites that included in the sale are 902 shares of four per cent noncumulative preferred stock convertible into common at the rate of twenty shares of common for each share of preferred. The third paragraph provides that the sellers will exercise their right of conversion upon request of the purchaser, and the fifth paragraph provides that in the event, by the title date, the sellers have not obtained possession of any of the shares contracted to be sold, it will suffice if they deliver documents evidencing transfer of title. Absent a demand for conversion, and none was made, the sellers clearly had the right to deliver the unconverted preferred on the basis of twenty shares of common for each preferred share. Since it is undisputed that, by any test, the sellers owned 902 shares of preferred and that in the absence of a demand those shares would satisfy the requirements of the contract, there is nothing to the claim that in this respect the sellers contracted to sell what they did not own.

C. Violation of Section 16(c) (2).

 The third defense to the sellers' counterclaim is that the transaction violated Section 16(c) (2) of the 1934 Act,[30] which provides that one who sells stock owned by him of a company, of which he is a director or officer, must "deliver it against such sale within twenty days thereafter," but that no violation occurs if he proves that "notwithstanding

---

27. The parties appear in agreement that the question of the nature of the interest created by the specific bequest of the shares under the will is one of local law (New York, in this instance) and that whether the interest so created is sufficient to satisfy the requirements of Section 16(c) (1) is governed by the Securities Act of 1934.

28. Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

29. Rule 16a-4 (17 C.F.R. 240.16a-4) gives executors one year from a decedent's death in which to file.

30. 15 U.S.C. § 78p(c) (2).

the exercise of good faith he was unable to make such delivery or deposit within such time, or that to do so would cause undue inconvenience or expense." This provision is complementary to Section 16(c) (1) and is intended to prohibit insiders' "sales against the box," which differ from a "short sale" in that the seller owns (has in the "box") sufficient shares to cover the sale. In such a sale the insider's identity is not disclosed until he delivers the securities, which enables him to conceal his sale and thus either cover the transaction from his box or acquire stock in the open market, whichever is most advantageous at the time.[31] The essential thrust of Section 16(c) (2) is to prevent such "sales against the box." [32] The guarantors and the purchaser contend that the instant contract was in violation of the statute, and in consequence is void because it did not require delivery of the stock, at least into escrow, "against such sale within twenty days" from the date of its execution—that, in fact, no stock was delivered until May 9, nearly two months after its date. The sellers, on the other hand, advocate a position urged by the amicus curiae and accepted by Judge Dawson on the motion for summary judgment, namely, that the statutory period begins to run, not from the date of the agreement, but from the date on which delivery was due. The Court finds it unnecessary to choose between these conflicting constructions, for it concludes that there was a sufficient showing here of "undue inconvenience" on the part of the sellers. There was some difficulty and understandable time-consuming delay in effecting a release of the bequeathed shares due in part to the sellers' need to meet their portion of the estate taxes and other delay not unusual in any estate administration; in addition, other shares which were the subject of the sale had previously been pledged as collateral for a loan and it was necessary to obtain the return of the pledged securities. Moreover, in view of the broad exception which the Congress permitted in establishing a twenty-day limitation, the Court finds no warrant for applying Section 16(c) (2) in a draconian fashion. Accordingly, since the timing of delivery was arranged to suit the purchaser's and the guarantors' purposes, they may not now be heard to complain that the contract, which included a clause for their specific benefit, is unenforceable. In any event, the securities delivered on May 9 and those delivered in escrow against the sale were the very securities owned by the sellers.

### D. Failure to Perform.

Finally, the Fullers claim that in various respects the sellers failed to perform conditions precedent, and in consequence are barred from recovering the balance of the purchase price.

■■■■■ First, the guarantors contend that although they consented to an amendment of the delivery date of the initial installment of 35,000 shares from June 1 to April 24, 1961, delivery was not made until May 9. This is true, but it is equally true that the amendment signed by the guarantors and the purchaser, and dated April 24, 1961, was not delivered to the sellers until May 9, whereupon simultaneous delivery of the 35,000 shares was made to the purchaser, following which he in turn delivered to the guarantors, who accepted and retained, their 8,500 shares. The amendment became effective upon its delivery on May 9 and there was due compliance by the sellers in accordance therewith. The claim is entirely without merit.

Second, the affirmative defense that the sellers failed to effect a timely distribution to themselves of shares of stock inherited from the estate of their father appears to have been abandoned; in any event the stock came into the possession of the sellers by January 25, 1962 and

---

31. See S.Rep.No. 1455, 73d Cong., 2d Sess. 52 (1934) and Provost v. United States, 269 U.S. 443, 450–53, 46 S.Ct. 152, 70 L.Ed. 352 (1926).

32. H.R.Rep.No. 1383, 73d Cong., 2d Sess. 24–25 (1934).

was delivered in escrow. The purchaser did not exercise his option to draw down the stock within the first year and the shares were in escrow in ample time before March 10, 1962, when the purchaser was obligated to draw down and pay for the first installment. There is no substance to this contention.

Third, the plaintiffs contend that no Federal or New York stock transfer taxes were paid either upon the transfer of the legacy shares from the estate to the sellers or upon their transfer by the sellers to the escrow agent; further, that none of the shares now held by the escrow agent representing those involved in the sale (other than the first installment of 35,000 shares) has any Federal or state tax stamps attached as required by paragraph 4 of the contract; and that no Federal or state stamps were purchased in connection with those certificates. Consequently, the guarantors assert that the sellers "were not ready, willing or able" to deliver the second installment of stock on March 10, 1962.

The substance of the guarantors' contention appears to be that these omissions (1) were in breach of the contract provision requiring the sellers to deposit the shares in escrow with stamps attached; (2) prevented the sellers from transferring to the purchaser good title to the shares; and (3) precluded them, by virtue of Section 278 of the New York Tax Law, from enforcing the contract.

First, we consider the claimed breach. Federal [33] and New York [34] law impose, in situations involving taxable transfers of stock, upon both the transferor and the transferee the duty of paying the required tax and affixing the stamps. However, under the stock purchase contract the parties agreed that the sellers were to pay the tax. The sellers make no contention to the contrary—indeed two days

after the delivery of the initial installment of 35,000 shares, as arranged with the purchaser, they paid the taxes on those shares directly to the transfer agent as computed by him. The balance of the shares were to "be deposited in escrow with tax stamps attached." However, payment was a requisite before the purchaser was entitled to delivery and transfer of the shares. If he exercised his option to take down all the shares within one year, he was to make "simultaneous payment." If he failed to exercise his option, then with respect to the first and subsequent installments which he was obligated to take down, he was not entitled to delivery of the shares until satisfactory proof of payment was given to the escrow agents. The purchaser was never entitled to receive the escrow shares because he and the guarantors defaulted in their obligation to pay for the March 1962 installment. Yet they contend that the sellers' failure to deposit the escrow stock with stamps attached, as required by paragraph 4, precludes recovery.

The guarantors' argument as to the alleged breach of the contract must be rejected. Had the purchaser and the guarantors adhered to their obligation to take down and pay for the stock on March 10, 1962, the sellers could have either paid the tax and affixed the stamps at the time of delivery of the shares, or made a cash allowance to the purchaser, who could then pay the tax or, as in the instance of the initial delivery of the 35,000 shares, paid the tax directly to the transfer agent. That the escrow shares did not have stamps attached was not of consequence, since the defaulting plaintiff-guarantors and purchaser were not injured in any respect. The sellers were, and are, ready, willing and able to perform upon payment for the shares, and the Court so finds.

33. 26 U.S.C. § 4383; Raybestos-Manhattan, Inc. v. United States, 296 U.S. 60, 61, 55 S.Ct. 63, 80 L.Ed. 44 (1935); United States v. Niagara Hudson Power Corp., 53 F.Supp. 796, 801 (S.D.N.Y. 1944).

34. N.Y. Tax Law § 270(3); Shaeffer v. Lerch, 11 A.D.2d 901, 203 N.Y.S.2d 111 (4th Dep't 1960).

The guarantors' next contention that the sellers' failure to affix the stamps prevented them from transferring good title is likewise unsound. While it may be true that the transfers of the stock, first from the estate of Louis Dilbert to the sellers and then from the sellers to the escrowees pursuant to the stock purchase contract, were taxable events as a matter of Federal[35] as well as of New York law,[36] and that a duty to affix stamps arose on each, the failure to affix stamps nevertheless would not, as the guarantors contend, have invalidated the transfer. The New York courts have explicitly held that the failure to affix New York tax stamps does not affect the passage to a transferee of title to stock, calling the "presence or absence of stamps * * * immaterial."[37] Similarly, the Supreme Court has said that "the stock transfer tax is a revenue measure exclusively,"[38] and accordingly the Federal statute should also be construed as not affecting passage of title. And as Judge Learned Hand said in a somewhat related situation: "It would be an extremely harsh, indeed an altogether subversive, doctrine to hold that the absence of a stamp prevented the passage of title."[39]

The guarantors' third defense—that Section 278 of the New York statute[40] precludes a seller who has failed to attach stamps from invoking judicial aid in enforcing a stock purchase contract against a recalcitrant purchaser and thus against them—likewise fails.

The New York courts have held that where a party is under a statutory duty to pay the transfer tax and himself has failed to do so, he may not invoke Section 278 to take advantage of the failure of any other party who is under a similar duty.[41] The fact stressed by the guarantors that the parties here agreed that the statutory duty imposed under Section 270 was to be fulfilled by the sellers neither discharged the purchaser's duty to pay the tax nor does it bring Section 278 into play—indeed, one State Court has suggested that the amendment to Section 270 which imposed the duty to pay the tax upon transferees as well as transferors has nullified the effect of Section 278.[42] At most that covenant gave the purchaser and the guarantors, had they been ready to fulfill their respective commitments, the right to reject the tender of the shares if without stamps and the right to indemnity for any transfer taxes actually paid by them upon the transaction.

The next defense is that the sellers failed to execute valid irrevocable proxies in favor of the purchaser covering all the shares of common stock sold as required by the agreement. This claim is without merit. The sellers, when the contract was signed, executed proxies covering all the stock owned by them, either beneficially or of record, and later, as executors, executed proxies to cover the 97,654 shares of stock still held by the estate of Louis Dilbert. The sellers now claim

35. That the transfer from the estate to the sellers was a taxable event under Federal law, see Treas.Reg. § 47.4321-2 (2). No support exists, however, for the guarantors' further contention that the transfer to the escrowees was a taxable event under Federal law. But see Treas. Reg. § 47.4321-1(a), which provides that the tax attaches as soon as stock is sold.

36. Phillips v. Grossman, 76 Misc. 497, 135 N.Y.S. 567 (Sup.Ct.1912).

37. In re Crump's Estate, 175 Misc. 191, 192, 22 N.Y.S.2d 956, 957 (Surrogate's Ct. 1940), appeal dismissed, 261 App.Div. 1053, 27 N.Y.S.2d 779 (1st Dep't 1941), rev'd on other grounds, 289 N.Y. 287, 45 N.E.2d 447 (1942). Accord, Rogers v. Ballenberg, 68 F.2d 730 (2d Cir. 1934); Murphy v. Meyer, 155 Misc. 753, 280 N. Y.S. 550 (City Ct.1935).

38. Raybestos-Manhattan, Inc. v. United States, 296 U.S. 60, 62, 56 S.Ct. 63, 64, 80 L.Ed. 44 (1935) (dictum).

39. Rogers v. Ballenberg, 68 F.2d 730, 731 (2d Cir. 1934).

40. N.Y.Tax Law § 278.

41. Shaeffer v. Lerch, 11 A.D.2d 901, 203 N.Y.S.2d 111 (4th Dep't 1960); Green v. Green, 7 Misc.2d 324, 166 N.Y.S.2d 883 (Sup.Ct. 1957).

42. Green v. Green, 7 Misc.2d at 325, 166 N.Y.S.2d at 884.

that this latter proxy was defective because it was signed by only two of the three executors and because executors lack power to give irrevocable proxies. All proxies were accepted and retained without objection. Moreover, they were used by the Fuller group to oust Cohen, install a new management, and elect the purchaser as Cohen's successor and two of the Fullers to the new board of directors.

Apart from the fact that, as already found, the two sellers had a substantial ownership interest in the bequeathed shares, sufficient to enter into the contract itself, the guarantors and the purchaser, by accepting and using the proxies, waived any claim as to their validity.

The guarantors' final contention that the defendants breached the agreement is that the sellers refused to accept the written tender to them by Abraham Dilbert on April 19, 1962 of $155,448 with interest covering the installment of shares that were to have been taken down on March 10, 1962, on the default of which the sellers declared the entire balance for the remaining installments due. This plea likewise must be rejected. The short answer is that the so-called tender was inadequate, since the entire balance had been declared due under the acceleration clause, and the sellers accordingly were under no duty to accept it.[43] The offer covered the past due installment, whereas by reason of the default the entire balance of the purchase price was payable.

In sum, the Court concludes that none of the defenses advanced defeats the sellers' right to recovery on their claim; that the sellers have complied with all conditions on their part to be performed and at all times were and are ready, willing and able to comply with their commitments under the agreement, but that the guarantors and the purchaser, without cause, breached their respective obligations.

Arthur Dilbert is entitled to judgment in the sum of $391,620 and Samuel Dilbert to judgment in the sum of $385,620, each with interest from the 10th day of March, 1962, against the purchaser and the guarantors, jointly and severally; also to judgment dismissing upon the merits the respective claims of the guarantors and the purchaser.

Judgment may be entered accordingly.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

43. Cf. Schaefer v. Thompson, 237 N.Y. 55, 142 N.E. 351 (1923).