In re R. V. SMITH CO., Inc.
No. 7851.

District Court, W. D. Oklahoma.

March 17, 1941.

C. L. Yancey and G. C. Spillers, both of Tulsa, Okl., and H. L. Douglass, of Oklahoma City, Okl., for petitioning creditors.

E. J. Schoen, of Chicago, Ill., and W. A. Lybrand, of Oklahoma City, Okl., for alleged bankrupt.

VAUGHT, District Judge.

An involuntary petition in bankruptcy has been filed in this cause against the alleged bankrupt, the petitioning creditors be-

ing the Pennzoil Company, Lee Larson and Company, and Fred Wood.

The petition alleges, first, that the alleged bankrupt owes in excess of $1,000 and is not a wage earner or tiller of the soil; second, that the petitioners are creditors of said alleged bankrupt, having provable claims against it, fixed as to liability and liquidated in amount, amounting in the aggregate in excess of the value of securities held by them in excess of $500, and sets out the nature and character of their claims; and, third, that the alleged bankrupt within four months next preceding the filing of the amended petition, while insolvent and wholly unable to pay its debts, committed certain acts of bankruptcy as follows:

That the alleged bankrupt on or about the 16th of December, 1940, delivered to the H. M. S. Corporation, an Oklahoma corporation, of Oklahoma City, certain of its assets, namely, accounts receivable, for the purpose of securing an antecedent indebtedness, and that on approximately the same date, the alleged bankrupt transferred to the H. M. S. Corporation certain insurance policies on the life of one R. V. Smith, for the purpose of securing an antecedent debt, said acts constituting a preference.

That upon or about January 6, 1941, the alleged bankrupt made an assignment for the benefit of its creditors in that it did appoint liquidating trustees, said trustees operating under a certain agreement made and entered into between the R. V. Smith Company, Inc., an Oklahoma corporation, by R. V. Smith, president, same being attested by Lawler Reeves, secretary, in behalf of the alleged bankrupt, and C. M. Riedell and F. A. Cyr, both of New York City, New York, as trustees, and that said trustees immediately took charge of the assets of said corporation and proceeded in liquidation.

The alleged bankrupt has filed its answer, in which it admits that it owes debts in excess of $1,000 and is not a wage earner or tiller of the soil. It denies that the petitioners are creditors of the alleged bankrupt, having provable claims against it, fixed as to liability and liquidated in amount, amounting in the aggregate in excess of the value of securities held by them in excess of $500.

It admits that the Pennzoil Company holds notes and trade acceptances, which on their face are past due, of the approximate amount of $69,932.10; that said trade acceptances and notes were given for goods, wares and merchandise sold and delivered by it to the alleged bankrupt at its special instance and request, but denies that the claim of the Pennzoil Company against the alleged bankrupt is liquidated in said sum of $69,932.10 or in any other sum whatsoever, and alleges that the Pennzoil Company has acknowledged an off-set against said indebtedness in the sum of $7,068.37, and that there is a further credit and off-set in an unliquidated amount against said indebtedness resulting from breach of a contract of the Pennzoil Company with the alleged bankrupt in that said Pennzoil Company had contracted and agreed with the alleged bankrupt that during the year 1940, from and after July 1 thereof to the end of said year, the alleged bankrupt was to have a rotating credit of $75,000 and because of the said Pennzoil Company's failure to respect said credit limitation and continue to carry on its business, ship oil and extend credit to the alleged bankrupt in said amount, said alleged bankrupt suffered loss for which the Pennzoil Company is liable in damages.

It furthermore denies that Lee Larson and Company or Fred Wood are creditors of said bankrupt.

It denies that on January 6, 1941, the alleged bankrupt was insolvent but it admits that it was then unable to pay its debts as they became due, but alleges that the inability of the alleged bankrupt to meet its debts was directly caused by the alleged breach of contract by the Pennzoil Company.

It denies that it made, on January 6, a general assignment for the benefit of its creditors or made the equivalent of a general assignment, for the reason that the said alleged bankrupt did not set over or assign title to all or any of its property to said trustees.

The alleged bankrupt further alleges in its motion to dismiss that the creditors' petition and amendment thereto were not verified as provided by law, and the alleged bankrupt has demanded a trial by jury in respect to the question of its insolvency and of all acts of bankruptcy alleged in said petition or in the amendment thereto.

Under the demand for jury trial, the alleged bankrupt is entitled to a jury trial on the question of its insolvency and of any act of bankruptcy alleged in such

petition. All other questions are questions to be determined by the court.

█ The amended petition is in the form provided by statute, Sec. 59, sub. b, Bankruptcy Act, as amended by Act of June 22, 1938, 11 U.S.C.A. § 95, sub. b. It is signed by each of the creditors by a proper officer thereof and each of the creditors has subscribed to an oath in accordance with forms 3 and 123A as prescribed by the Supreme Court of the United States. The court, therefore, holds that as a matter of law the petition is proper and sufficient in form.

The next question is whether or not the petitioning creditors are in fact creditors.

With reference to petitioning creditors Lee Larson and Company and Fred Wood, all of the evidence shows that said creditors are creditors in good faith, and no evidence was introduced to the contrary.

As to the Pennzoil Company, on the 28th of December, 1936, a written contract was entered into between the alleged bankrupt and the Pennzoil Company, which contract described the territory covered by, the term of the contract, quotas, prices, quantity purchase discount, change of prices, terms of payment, advertising appropriation, signs, direct sales help, conditions of agreement, and all other matters relating to the future acts and conduct of the parties with respect to said agreement. The particular portions of the contract material in this trial are the terms of payment and modifications of the contract. It provides: "Subject to approved credit, terms of payment are one (1%) per cent discount for cash in ten days; net cash in thirty (30) days from date of shipment. No cash discount allowed on taxes or freight."

The contract further provided it could not be transferred or assigned without the written consent of the seller, and that such transfer or assignment would render the contract subject to immediate forfeiture. It also provided: "This agreement is to continue from date of execution until terminated by either party on sixty (60) days notice in writing, or for cause at any time as hereinafter provided."

And further:

"No changes, alterations, modifications or amendments to this contract shall be binding on either party unless the same be first reduced to writing and executed by the respective parties in the same manner as provided for the execution of this contract."

\* \* \* \* \* \*

"That this paper contains the entire contract, and there are no oral promises, representations or warranties, inducing, changing or modifying the same."

On July 11, 1940, it is admitted, that the alleged bankrupt was indebted to the Pennzoil Company in the sum of $77,000, none of which was secured in any manner but was represented by a note in the sum of $50,000, on which certain payments had been made, and by certain trade acceptances and open accounts.

On said date, a conference was had in Oil City, Pennsylvania, the principal office of the Pennzoil Company, by R. V. Smith, the president of the alleged bankrupt company, C. M. Riedell, the auditor and adviser of the alleged bankrupt, and certain officers of the Pennzoil Company, in which it was agreed that the Pennzoil Company would withhold for the time being the strict enforcement of the contract but would make certain specified shipments of oil each month during the remainder of the year 1940, and that certain payments were to be made by the alleged bankrupt, reducing the existing indebtedness and to apply on the purchases of oil during said period.

There were numerous telephone communications, oral conferences, and letters passing between the alleged bankrupt and the Pennzoil Company, covering this period, the Pennzoil Company refusing to ship oil at various times, on its representation that the alleged bankrupt had not met the monthly payments as provided in the oral agreement of July 11, 1940.

The alleged bankrupt, through its officers, R. V. Smith, president, Lawler Reeves, secretary, and C. M. Riedell, auditor and adviser, testified that there was an oral agreement between the alleged bankrupt and the Pennzoil Company, that the Pennzoil Company, during the period from July 11 to December 31, 1940, would give to the alleged bankrupt a rotating credit limit of $75,000.

Reeves testified that he was not present at the time this agreement was made but that the officers of the company had advised him from time to time that said contract was made. He further testified that he had a partial agreement to that extent in March or April, 1940, with the credit

manager of the Pennzoil Company, and that he was operating under that tentative agreement even up until July 11, 1940.

R. V. Smith testified that he was present at the meeting on July 11, 1940, but up until that time there had been no mention of a limit of credit and that he never heard the $75,000 limit mentioned prior to that time.

The credit manager of the Pennzoil Company, who was in charge of the credit department with the aid of the credit committee, and who was present at all of the conferences with reference to extending additional credit, testified that the $75,000 limit was never mentioned at any time and that they had never recognized any such line of credit for the alleged bankrupt.

The treasurer of the corporation, who was also a member of the credit committee, testified that he never heard the $75,000 limit mentioned until after this petition in bankruptcy was filed.

The question is, Was such a limit agreed upon?

The alleged bankrupt and the Pennzoil Company are both business concerns that have been in business many years and they handle business to the extent of millions of dollars. They entered into a written contract and this written contract attempted to set out in detail the actual contract between the parties, and it specifically provided that "no changes, alterations, modifications or amendments to this contract shall be binding on either party unless the same be first reduced to writing and executed by the respective parties in the same manner as provided for the execution of this contract."

It is admitted by all of the parties that no written contract was entered into which provided for a line of rotating credit to the extent of $75,000.

It is hardly reasonable that an oral agreement to postpone temporarily the collection of past due accounts could be construed as a modification of a written contract.

Passing upon the credibility of witnesses is a rather serious matter. The alleged bankrupt had gotten behind, badly, in its accounts and on December 31, 1940, the audit shows, and the parties admit, that the alleged bankrupt, after allowing all credits for bonuses or discounts, was indebted to the Pennzoil Company in the amount of $62,863.73; that it was indebted to the U. S. Rubber Company in the amount of $81,436.-

87; that it was indebted to the Seiberling Tire Company in the amount of $21,662.16; and that it was indebted to H. M. S. Corporation in the approximate amount of $14,500.

With reference to these accounts, the U. S. Rubber Company had under its contract, assignments of accounts and bills payable in excess of $69,000 as security for its claim; the Seiberling Tire Company had school bonds of the face value of $29,000 to secure its claim of $21,000; and the H. M. S. Corporation had an assignment of certain bills payable and insurance policies, as security for its claim. Of the large claims, in fact, the principal creditor, the Pennzoil Company, with a claim in excess of $62,000, had no security of any character.

In the latter part of December, 1940, the Pennzoil Company's representatives were advised that unless they did give further credit to the alleged bankrupt, the alleged bankrupt would go into immediate liquidation and the Pennzoil Company would recover on its claim somewhere from ten to fifty per cent.

On the 3rd day of January, 1941, the credit manager of the Pennzoil Company was advised by the representatives of the alleged bankrupt that the said alleged bankrupt had actually executed a liquidation agreement and contract which provided that the business of the alleged bankrupt was to be placed in the hands of trustees for immediate liquidation, and thereafter, on the same date, the Pennzoil Company sent a letter by registered mail cancelling and terminating its contract with the alleged bankrupt, effective immediately.

It is now the contention of the alleged bankrupt that its failure to continue business resulted directly from the refusal of the Pennzoil Company to extend a line of credit of $75,000 without any security, and that the failure and refusal of the Pennzoil Company to extend such line of credit damaged the alleged bankrupt in an amount equal or more than the claim of more than $62,000, which the books showed was due and owing the Pennzoil Company.

 With respect to this proposition, the court holds that as a matter of law, a written contract cannot be modified by oral agreement.

 Furthermore, that the evidence introduced in this case is not sufficient to establish even an oral agreement on the part

of the Pennzoil Company to extend credit of $75,000 and that, therefore, the contention that such a line of credit actually existed and that the alleged bankrupt has been damaged to an extent that would more than offset the claim of the Pennzoil Company is not supported either by the evidence or by law.

The court, therefore, holds that the Pennzoil Company is a legal creditor in excess of $62,000 and that the petitioning creditors are legal and valid petitioning creditors under the bankruptcy law.

It is admitted, as stated before, that the alleged bankrupt on the 16th day of January, 1941, was unable to pay its obligations as they matured and that on or about January 3, 1941, an assignment was prepared and executed by R. V. Smith, C. M. Riedell and F. A. Cyr, in which the company designated and appointed Riedell and Cyr, both of New York City, together with L. W. Rogers, of Oil City, Pennsylvania, as trustees and to be liquidating trustees of the entire business and assets of the alleged bankrupt company. The said trustees were authorized "to collect, for and in the name of the company all amounts now or hereafter owing to the company; to sell, assign and transfer, and to collect the proceeds of sale of all property of the company, of every nature and description and wheresoever situated; to liquidate, settle and compromise the lease of the company upon the real estate known as 1-7 N. W. Third St., Oklahoma City, Oklahoma; and in general to liquidate and to convert into cash so far as possible all of the assets and business of the company, upon such terms and at such prices as the trustees in their discretion may deem proper, whether by way of sale or compromise, and to deposit the proceeds of such liquidation from time to time in such bank or banks as the trustees may select, in the name of and for the account of the company."

\*　　\*　　\*　　\*　　\*　　\*

"The company further authorizes the trustees to pay from time to time out of the assets of the company the expenses of the trustees incident to such liquidation, the costs of maintaining the assets and business of the company during such liquidation, and the claims of all persons, firms or corporations, which the trustees shall determine to be proper creditors of the company, by from time to time distributing the proceeds of such liquidation, at such times as they may determine, pro rata, to the creditors of the company in payment of their claims, until said creditors shall have been paid in full or until all of said proceeds shall have been so distributed, as the case may be."

In other words, the contract provided for complete liquidation of all of the assets of the company.

When this agreement was submitted to L. W. Rogers, of Oil City, Pennsylvania, who is credit manager of the Pennzoil Company, he declined to sign it. In the meantime, however, the trustees in New York had placed their representative in charge of the business on either the 3rd or 4th of January, 1941. On January 11, 1941, a new contract was executed by the same parties that executed the first one, and in substantially the same language, with the exception that L. W. Rogers was eliminated as trustee and C. M. Riedell and F. A. Cyr were designated as the trustees.

Immediately upon the execution of the second agreement, the trustees delivered, in effect, the assignment of more than $69,000 of bills receivable to the U. S. Rubber Company, of which, trustee Cyr was the managing officer.

The statement, with reference to the execution of these liquidation agreements, is not contradicted but is admitted.

The next question to determine is whether or not certain acts of bankruptcy were committed.

The court is of the opinion that the acts of the alleged bankrupt, with reference to H. M. S. Corporation, covering the period of time from October until December, 1940, and within the four months preceding the filing of this petition, do not constitute acts of bankruptcy for the reason that the H. M. S. Corporation in fact received no payments on a pre-existing debt but paid to the alleged bankrupt by way of loans and payments in cash, a sum in excess of that which it received during the same period.

That brings us to the last question.

Section 3, Chapter III, Revised Bankruptcy Act, 11 U.S.C.A. § 21, defines acts of bankruptcy and provides: "Acts of bankruptcy by a person shall consist of his having \* \* \* (4) made a general assignment for the benefit of his creditors; or (5) while insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the ap-

pointment of a receiver or trustee to take charge of his property; * * *."

I am not at all satisfied that even under the act and under the construction that has been placed on similar acts by Federal Courts, the instruments executed on the 3rd and the 11th of January, 1941, did not constitute an assignment for the benefit of creditors.

The only possible argument that could be urged against such a document as an assignment for the benefit of creditors is that it did not expressly convey the title of the property to the trustees. However, under the second provision, there is no question that at the time when the alleged bankrupt was unable to pay its debts as they matured, it procured, permitted, or suffered voluntarily the appointment of trustees to take charge of its property.

The court will not stand on a technicality with reference to form, when substance is alleged. The involuntary petition alleges that the alleged bankrupt did make an assignment for the benefit of creditors, in that it did certain acts, and then described and set out the acts which are provided to be done by the trustees in the liquidation agreement, as hereinbefore set out. The alleged bankrupt urges that since the petitioning creditors did not specifically allege this particular act, under the term in which it is defined and described in the Bankruptcy Act itself, it cannot be urged at this time.

The petition did state the substance and stated the particular acts which the alleged bankrupt had committed, and it therefore becomes a question of law whether or not those acts, as alleged, constitute an act of bankruptcy, and since it is admitted that the liquidation agreements also were executed, as alleged, and that at the time the alleged bankrupt was unable to pay its debts as they matured, no fact remains to be submitted to the jury.

The jury is instructed to return a verdict to the effect that an act of bankruptcy was committed by the alleged bankrupt in that, while unable to pay its debts as they matured, it procured, permitted or suffered voluntarily the appointment of trustees to take charge of its property.

Having reached this conclusion, that a specific act of bankruptcy had been committed, it becomes unnecessary to pass upon the question of whether or not the alleged bankrupt was solvent or insolvent. An adjudication that the alleged bankrupt is a bankrupt must follow.

To all of which, an exception is allowed.