471 F.2d 178
 In the Matter of Blair & Co., Inc., Debtor.
BLAIR & CO., INC. and Patrick E. Scorese, as Liquidator
appointed by the New York Stock Exchange, Inc. for
Blair & Co., Inc., Appellants,
v.
John P. FOLEY, Jr., et al., Appellees.
 No. 144, Docket 72-1554.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 9, 1972.
Decided Dec. 11, 1972.
Certiorari Granted April 16, 1973.
See 93 S.Ct. 1901.
 
 Harvey R. Miller, New York City (Charles Seligson, Weil, Gotshal & Manges, and Michael L. Cook, New York City, of counsel), for Patrick E. Scorese, liquidator-appellant, and (Mudge, Rose, Guthrie & Alexander, New York City, of counsel), for Blair & Co., Inc., debtor-appellant.
 Leo H. Raines, New York City, for appellees.
 Before FRIENDLY, Chief Judge, and MANSFIELD and TIMBERS, Circuit Judges.
 FRIENDLY, Chief Judge:
 
 
 1
 This appeal raises an interesting question concerning the interpretation of Sec. 3a(5) of the Bankruptcy Act. Under that subsection it is an act of bankruptcy if any person
 
 
 2
 (5) while insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property.
 
 
 3
 Blair & Co., Inc. (Blair), a Delaware corporation, was engaged in the general brokerage and commission business, with its principal office in New York City. It was a member of the New York Stock Exchange (NYSE) and two other exchanges. At the time of its adjudication as an involuntary bankrupt, it had some 28,000 customer accounts and held more than $75,000,000 in securities, some $40,000,000 of which, including those of customers, were pledged to banks as collateral for loans of approximately $30,000,000.
 
 
 4
 As a result of operating losses and a concomitant shrinkage of capital, Blair, in the early summer of 1970, began a program of self-liquidation, which involved the transfer of customer accounts to other broker-dealers and the delivery of securities to customers requesting this. Allegedly Blair believed at the time that its resources were sufficient to enable it to discharge its obligations to all customers and general creditors. Late in September, Blair concluded that implementation of the program might require the assistance of the Special Trust Fund which NYSE had established in 1964 to avoid the bankruptcy of member firms, with attendant hardship to their customers and loss of confidence in the securities markets. See Constitution of the New York Stock Exchange, art. XIX, Sec. 1.
 
 
 5
 On September 21, Blair and certain other participants entered into an agreement with NYSE whereby the trustees of the Special Trust Fund would make loans and guarantees to assist Blair's customers against loss. In accordance with standard practice, the agreement provided that, immediately upon the first loan, guarantee or advance by the trustees, NYSE should have the right to appoint a Liquidator of its own choosing. Paragraph VIII of the agreement described the powers and duties of the Liquidator as set forth in the margin.[1] Simultaneously Blair executed another instrument which more specifically delineated the powers to be conferred on the person who might be appointed, such person being described as "the true and lawful attorney and agent of and for [Blair]."
 
 
 6
 On September 25, 1970, the trustees of the Special Trust Fund made a first advance of $1,000, which triggered the appointment of Patrick E. Scorese as Liquidator. Although the trustees were allegedly prepared to advance a total of $15.9 million, all payments ceased when, four days later, appellees J. P. Foley & Company, Inc., John P. Foley, Jr., its President, and Anita Salisbury, his secretary (hereinafter collectively referred to as Foley), holders of subordinated debentures of Blair, filed an involuntary petition in bankruptcy against Blair in the District Court for the Southern District of New York. After answering and demanding a jury trial, Blair and Scorese moved for summary judgment dismissing the petition; Foley crossmoved for a summary adjudication of bankruptcy. Concluding that Blair's consent to the appointment of Scorese as liquidator constituted the fifth act of bankruptcy, Referee Herzog, in a decision dated April 13, 1971, denied the motion of Blair and Scorese and granted Foley's. The Referee's order of adjudication, entered April 27, 1971, stayed all proceedings subject to the order of Referee Lowenthal, who had been put in charge of the case. On April 15, 1971, Blair filed a petition for relief under Chapter XI of the Bankruptcy Act, Sec. 321, and applied for a stay of administration pursuant to Sec. 325. This appeal followed Judge Cooper's denial, on March 15, 1972, of a petition to review the order of adjudication. So far as the record shows, no trustee has been elected and the liquidator has continued to function.
 
 
 7
 Although Foley's petition had alleged three acts of bankruptcy, no serious attempt was made to support the first two[2] before the referee, in the district court or here. Blair and Scorese argued at length, but without success, that, because of certain special circumstances unnecessary to detail, Foley was not a subordinated creditor but a stockholder. Although we do not find appellants' arguments on this point legally persuasive, we need not decide the issue since we hold that the referee and the district judge erred in concluding that Blair had committed the fifth act of bankruptcy.
 
 
 8
 Before attempting to construe Sec. 3a(5), it is useful to remind ourselves of the purpose of requiring an act of bankruptcy as a condition to an involuntary adjudication. As said in 1 Collier, Bankruptcy p 3.03, at 403 (rev. ed. 1971) (footnotes omitted):
 
 
 9
 This requirement of alleging acts of bankruptcy appears to be peculiar to Anglo-American jurisprudence. In countries following the Civil Law mere cessation of payment by the debtor is sufficient to ground a creditor's petition. Anglo-American law, however, affords protection against arbitrary or unjust interference with the property of the debtor by providing that he shall not be amenable to bankruptcy at the instance of creditors unless he has done, or suffered to be done, certain acts, principally concerning his property.
 
 
 10
 The underlying philosophy was also explained by the Supreme Court in a decision which, although arising under an earlier Bankruptcy Act, applies in many respects to the present statute:
 
 
 11
 There is nothing in the Bankruptcy Act, either in its language or object, which prevents an insolvent from dealing with his property, selling or exchanging it for other property at any time before proceedings in bankruptcy are taken by or against him, provided such dealing be conducted without any purpose to defraud or delay his creditors or give preference to any one, and does not impair the value of his estate. An insolvent is not bound, in the misfortune of his insolvency, to abandon all dealing with his property; his creditors can only complain if he waste his estate or give preference in its disposition to one over another. His dealing will stand if it leaves his estate in as good plight and condition as previously.
 
 
 12
 Cook v. Tullis, 85 U.S. (18 Wall.) 332, 340, 21 L.Ed. 933 (1874).
 
 
 13
 It is undisputed that two of the conditions of Sec. 3a(5) were here fulfilled. Blair was insolvent or unable to pay its debts as they matured, and it permitted the appointment of Scorese to "take charge" of its property in the ordinary meaning of that term. But that is not enough unless Blair permitted Scorese to be appointed as "a receiver or trustee." The crucial question is what Congress meant by these words.
 
 
 14
 The Liquidator did not meet what is usually regarded as essential to the status of a receiver, namely, appointment by a court.
 
 
 15
 A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation pendente lite, when it does not seem reasonable to the court that either party should hold it. He is not the agent or representative of either party to the action, but is uniformly regarded as an officer of the court . . . .
 
 
 16
 High, A Treatise on the Law of Receivers, ch. 1, Sec. 1, at 2-3 (4th ed. 1910); see Booth v. Clark, 58 U.S. (17 How.) 338, 348, 15 L.Ed. 164 (1855).[3] Just as a receiver is not, without more, an agent, Ledbetter v. Farmers Bank & Trust Co., 142 F.2d 147 (4 Cir. 1944), so an agent, even one with powers as extensive as Scorese's, is not, without more, a receiver. The Liquidator also lacked one element essential to the normal concept of trusteeship, namely, legal title to the property. See Restatement of Trusts 2d, Secs. 2 and 8 & comment a. (1959). In this respect the case differs essentially from In re Bonnie Classics, Inc., 116 F. Supp. 646 (S.D.N.Y.1953), on which the referee and the district court mistakenly relied. Judge Weinfeld there held, with obvious correctness, that the filing of a certificate of dissolution under then Sec. 105 of the New York Stock Corporation Law was an act of bankruptcy under Sec. 3a(5), for the very reason that legal title "'was vested in the directors as trustees for creditors and stockholders."' Id. at 648.
 
 
 17
 To look at the matter some-what more broadly, receivership and trusteeship both entail the consequence, as does the fourth act of bankruptcy, "a general assignment for the benefit of creditors," that creditors cannot pursue their ordinary remedies against the debtor and his property but are relegated to proceeding, in one way or another, with respect to the assignee, receiver or trustee. By establishing the fourth and fifth acts of bankruptcy, Congress made a policy determination that when an insolvent debtor, even with the best of motives, has placed such obstacles in the way of creditors, the latter should be able to invoke a federal statutory procedure which includes the right to choose their own trustee. See Globe Ins. Co. v. Cleveland Ins. Co., 10 Fed.Cas. 488, 492 (No. 5486) (C.C.N.D.Ohio 1876), appeal dismissed, 98 U.S. 366, 25 L.Ed. 201 (1879). On the other hand, the mere grant of a power of attorney "for the purpose of winding up the affairs" of a corporation is not an assignment for the benefit of creditors and thus does not constitute the fourth act of bankruptcy, In re Ambrose Matthews & Co., 229 F. 309 (D.N.J.), aff'd, 236 F. 539 (3 Cir. 1916), since nothing prevents a creditor from pursuing his ordinary remedies. If the grant of such a power of attorney does not constitute the fourth act of bankruptcy, we fail to see why it should constitute the fifth when the words used by Congress would not normally lead to that result.[4]
 
 
 18
 This conclusion is reinforced by the history of the statute, which the referee and the district court did not discuss. While the Bankruptcy Act of 1898 made a general assignment for the benefit of creditors a fourth act of bankruptcy, 30 Stat. 546, it contained no provision corresponding to the present fifth act. To reconcile a conflict of decisions as to whether the appointment of a receiver or trustee was nevertheless within the fourth act, see statement of the Attorney General, H.R.Doc.No.9, 58th Cong., 2d Sess. 125 (1903), the Act of February 5, 1903, 32 Stat. 797, added the words "or, being insolvent, applied for a receiver or trustee for his property or because of insolvency a receiver or trustee has been put in charge of his property under the laws of a State, of a Territory, or of the United States." The effect of the amendment was greatly impaired by the holdings of a number of courts that Congress had used the term insolvency in the bankruptcy sense. See, e. g., In re Wm. S. Butler & Co., 207 F. 705 (1 Cir.), cert. denied, 231 U.S. 752, 34 S.Ct. 322, 58 L.Ed. 467 (1913); In re Valentine Bohl Co., 224 F. 685 (2 Cir. 1915). Some courts had sought to soften the blow by holding that it sufficed under the second clause if the debtor was in fact insolvent in the bankruptcy sense even though the petition had alleged only inability to pay maturing debts. See Davis v. Michigan Trust Co., 2 F.2d 194, 196 (6 Cir. 1924) (Mack, J.), aff'd sub nom. Mellon v. Michigan Trust Co., 271 U.S. 236, 46 S. Ct. 511, 70 L.Ed. 924 (1926), and cases there cited.
 
 
 19
 In the 1926 amendments to the Bankruptcy Act, Congress adopted the latter decisions by rewording the clause added in 1903 to state, somewhat ungrammatically when read in conjunction with the section's preamble, "or, while insolvent, a receiver or a trustee has been appointed, or put in charge of his property," 44 Stat. 663. See H.R.Rep.No.695, 69th Cong., 1st Sess. 4 (1926); H.R.Rep.No. 877, 69th Cong., 1st Sess. 7 (1926); Colin, An Analysis of the 1926 Amendments to the Bankruptcy Act, 26 Colum. L.Rev. 789, 792 (1926); and McLaughlin, Amendment of the Bankruptcy Act, 40 Harv.L.Rev. 341, 366-68 (1927). The Senate bill, S. 1039, had retained the words "under the laws of a State, of a Territory, or of the United States," see 67 Cong.Rec. 6800 (1926), but the Senate managers consented to their being stricken in the conference, the House managers stating that the "difference consists merely in phraseology," H.R.Rep.No.1257, 69th Cong., 1st Sess. 8 (1926). The House hearings provide further evidence that the removal of the language was not meant to affect the substance. See Hearings Pursuant to H.Res. 353 on Revision of the Bankruptcy Law Before the House Comm. on the Judiciary, 68th Cong., 2d Sess., ser. 51, at 38-39 (1925); Hearings on H.R. 5221 and H.R. 8119 Before the House Comm. on the Judiciary, 69th Cong., 1st Sess., ser. 4, at 17 (1926). In fact, the words had always been surplusage. A receiver appointed to take charge of a debtor's property is necessarily appointed "under the laws of a State, of a Territory, or of the United States," and a trustee would either be so or would be a common law assignee under the fourth act of bankruptcy-unless the insolvent had appointed him other-wise than for the benefit of all creditors in which case the transaction would be a fraudulent conveyance within the first act or a preference under the second. The 1926 amendment thus affords no indication that Congress meant "a receiver or trustee" to include a person who had some but not all of the historic attributes of these officers.
 
 
 20
 The courts continued to read the requirement of insolvency under the 1926 amendment in the bankruptcy sense. See 1 Collier, Bankruptcy, supra, p 3.501, at 496. To overcome this, and also to correct its grammar, Congress, in enacting the Chandler Act, changed the provision to its present form, 52 Stat. 844-45. The Senate Report emphasized that the purpose was to broaden the scope of the fifth act of bankruptcy "in order to reach the widely prevalent abuse of collusive equity receiverships." S.Rep.No.1916, 75th Cong., 3d Sess. 12 (1938); see also H.R.Rep.No.1409, 75th Cong., 1st Sess. 6 (1937). Not only was there no indication that Congress meant to extend the words "receiver or trustee" beyond their normal meaning to include a liquidating agent, but Sec. 2a(21), which was added in 1938, 52 Stat. 844, shows that when the draftsmen desired to cover such an agent, they considered it necessary to say so and knew how to do it. Section 2a(21) authorizes a bankruptcy court to "[r]equire receivers or trustees appointed in proceedings not under this Act, assignees for the benefit of creditors, and agents authorized to take possession of or to liquidate a person's property" to deliver the property in their possession or control to a representative of the bankruptcy court. In 1952, Congress amended Sec. 69d, to provide that upon the filing of a petition "a receiver or trustee, appointed in proceedings not under this Act, of any of the property of a bankrupt, an assignee for the benefit of creditors of a bankrupt, or an agent authorized to take possession of or to liquidate any of the property of a bankrupt" shall be accountable to the bankruptcy court for any action taken subsequent to the filing of a petition, shall file a schedule of assets and liabilities, shall make a sworn statement of his administration of the estate, and shall not make any disbursements or take other administrative action without authorization from the bankruptcy court. 66 Stat. 426. The House Committee explained:
 
 
 21
 Section 2(21) gives the court jurisdiction to require receivers or trustees, appointed in proceedings not under the act, as well as assignees for the benefit of creditors and agents authorized to take possession of or to liquidate a person's property, to deliver the property in their possession or under their control to a receiver or trustee appointed under the act. Section 69d, spelling out that power, requires a receiver or trustee, not appointed under the act, of any property of the bankrupt, to account to the bankruptcy court, but does not include the assignee and agent. The bill adds the necessary language and clarification.
 
 
 22
 H.R.Rep.No.2320, 82d Cong., 2d Sess. 15 (1952), U.S.Code Cong. & Admin.News 1952, pp. 1975-1976. Here again Congress manifested its belief that a liquidating agent was neither a receiver nor a trustee.
 
 
 23
 Foley asks us to disregard all this on grounds of policy, an argument that proved successful with the referee and the district judge.[5] While we doubt that we could justify so great a broadening of the words on such grounds, the policy argument is not sufficiently impressive that we need to consider this. It is essential to bear in mind that the first three acts of bankruptcy-fraudulent conveyances, preferences, and failure to vacate or discharge liens-apply as fully to action or inaction by a liquidating agent as by the principal. Foley contends that, despite this, the liquidator may make preferential transfers of which creditors may not be aware, may neglect to pursue claims as vigorously as would a trustee in bankruptcy, or may fail to elicit claims which an examination under Sec. 21a would develop. All this would be equally true if Blair had pursued its plan of self-liquidation. Foley's policy arguments are in reality a contention that Congress took the wrong turn when it required creditors to establish an act of bankruptcy and did not permit them to set the procedures of the Act in motion by a showing of insolvency alone.[6] But Congress made the choice long ago in Sec. 1 of the short-lived Bankruptcy Act of 1800, 2 Stat.1921, and repeated it in Sec. 1 of the Act of 1841, 5 Stat. 440-42, in Sec. 39 of the Act of 1867, 14 Stat. 536, and in the present statute. A court's duty is to construe what the legislature has said, not to substitute a new and debatable notion of policy which so many Congresses have rejected.
 
 
 24
 The order of the district court is reversed, with instructions to direct the referee to vacate the adjudication and dismiss the petition.
 
 TIMBERS, Circuit Judge (dissenting):
 
 25
 Some nineteen years ago, a wise and comprehending judge, in construing Section 3a(5) of the Bankruptcy Act, had this to say:
 
 
 26
 "I do not think it is necessary to resort to dictionary definition of 'appointment.' It is not required that the transferee of the property be formally 'appointed' as 'trustee' by a ceremonial document referring to him as such. The method adopted to effect the transfer is immaterial. It is the end result that counts. Any action by one who is insolvent which effectively causes the transfer of his property to another for final liquidation purposes appoints the transferee a 'trustee to take charge of his property' under Sec. 3, sub. a(5). By filing the petition for its dissolution the corporation 'procured, permitted or suffered voluntarily * * * the appointment' of such a trustee. Any other construction would defeat the objectives of the Bankruptcy Act and abort the broad powers of the courts of bankruptcy intended for the uniform administration of insolvent estates." In re Bonnie Classics, Inc., 116 F.Supp. 646, 648 (S.D.N.Y.1953) (Weinfeld, J.) (footnotes omitted).
 
 
 27
 While Bonnie Classics is distinguishable on its facts from the instant case, nevertheless, in my view, the considerations noted there by Judge Weinfeld should lead to the same result here where a corporation has agreed to the appointment of a liquidator with the power to "take control of the business and property of the Corporation for the purpose of liquidating the business of the Corporation."
 
 
 28
 The comprehensive legislative history set forth in the majority opinion does not compel the result reached by the majority. The language in the original Bankruptcy Act of 1898 relied on by the majority remained in the statute until 1926. At that point, a broad revision of the Act was effected, including the elimination of the requirement that the appointment of a receiver be by statute or judicial proceeding. 44 Stat. 663. While the majority correctly notes that the principal focus of the drafters of the amendment was on remedying an ambiguity regarding the preliminary requirement of insolvency, and that the elimination of the necessity of formal appointment was said to be simply a matter of change in phraseology, the majority overlooks the fact that if Congress truly had intended to limit the change to those goals, it surely need not have gone as far as it did. The result, as I see it, is that we are asked to find a narrow purpose behind an Act of Congress, despite the failure of Congress to demonstrate that narrow purpose in the statutory language through the use of drafting devices frequently employed. Where the effect of such a reading is to hold in favor of a party whose position relies on language expressly eliminated from the statute, and thereby to defeat a party whose position falls squarely within the remaining language, I should have thought that we would construe the amendment in the most sensible, rather than the narrowest, manner. As the Supreme Court said in Shamrock Oil & Gas Cop. v. Sheets, 313 U.S. 100, 107 (1941), if Congress had intended any other reading of the statute, "we can hardly suppose that it would have failed to use some appropriate language to express that intention."
 
 
 29
 Finally, I think it should be pointed out that, despite the majority's illuminating instruction on the definition of receivership, and its quite proper conclusion that the liquidator did not come within that definition, we are left with the possibility that the liquidator may qualify as a trustee. At least in the jurisprudence of bankruptcy,
 
 
 30
 "'Trustee' means much the same as 'receiver', the nomenclature varying in different states. The term is also intended, no doubt, to include liquidating agents generally, who, though performing much the same functions as receivers, may not be appointed by a court." 1 Collier on Bankruptcy p 3.502, at 501(14th ed. 1971) (latter emphasis added).
 
 
 31
 Cf. In re R. V. Smith Co., 38 F.Supp. 57, 62 (W.D.Okla.1941).
 
 
 32
 The issue on this appeal does not lend itself to easy resolution. The approach by the majority cannot be said to be an unreasonable one. I am unwilling, however, to reach a decision on the basis of language that Congress purposefully has removed from the statute, especially in the light of analysis as persuasive as that in In re Bonnie Classics, Inc., supra. I therefore respectfully dissent.
 
 
 
 [1]
 Immediately following his appointment by the Exchange, the Liquidator shall take control of the business and property of the Corporation for the purpose of liquidating the business of the Corporation and shall proceed as follows in connection with the liquidation:
 i.) he shall promptly take such steps as he may deem practicable to reduce the Corporation's operating expenses and to dispose of the Corporation's salable assets;
 ii.) he shall have power to retain independent public accountants, consultants, counsel and other agents and assistants and shall have power to augment and reduce or eliminate the staff of the Corporation;
 iii.) he shall, as soon as practicable, assert and collect or settle all claims and rights of the Corporation;
 iv.) he shall pay any claim against the Corporation considered by him to be a valid claim of any customer of the Corporation;
 v.) he shall take such other steps as he deems necessary or appropriate to liquidate the business of the Corporation. It is agreed that consistent with the duty of the Liquidator to effect a fair and orderly liquidation of the business of the Corporation to enable prompt settlement with its customers, the Liquidator shall act in accordance with what he deems to be good business practice.
 
 
 [2]
 These were an alleged fraudulent conveyance of a management contract with the Blair Fund and undescribed preferential transfers of $5,000,000 to unknown creditors
 
 
 [3]
 There are instances in which the term receiver is used to describe a party who has not been appointed by a court. See 1 Clark, A Treatise on the Law and Practice of Receivers Sec. 11 (3d ed. 1959). However, none of the exceptions to the normal usage of the term, see, e. g., 12 U.S.C. Sec. 191, are applicable to this case
 
 
 [4]
 The only case supporting the conclusion below is In re R. V. Smith Co., 38 F. Supp. 57, 62 (W.D.Okla.1941); we do not find its reasoning to be persuasive
 
 
 [5]
 These decisions would obviously have meant the end of the NYSE's Special Trust Fund plan, since the Exchange would scarcely advance funds in order to avert a bankruptcy if the attendant designation of a liquidator would enable the few creditors needed to meet the tests of Sec. 59b, as amended, 11 U.S.C. Sec. 95(b), to provoke it. For the future this problem is handled by the Securities Investors Protection Act of 1970, 15 U.S.C. Secs. 78aaa et seq. Section 5(b)(1)(A)(ii) and (iii) of SIPC, 15 U.S.C. Sec. 78eee(b)(1)(A)(ii) and (iii), gives some slight added support to our conclusion
 
 
 [6]
 This position finds some support in legal literature. One commentator, who traced the origins of the Anglo-American requirement of an act of bankruptcy has concluded that, while the requirement was sensible when the objective of bankruptcy law was to deal with the culpable acts of the debtor, this is no longer so now that the primary concern is with the debtor's financial condition rather than his conduct. Treiman, Acts of Bankruptcy: A Medieval Concept in Modern Bankruptcy Law, 52 Harv.L.Rev. 189, 200 (1938). Nevertheless; he believed that, so long as the present definition of insolvency was retained, elimination of the acts of bankruptcy would be "utterly impractical." Id. at 211. Proof of insolvency under the existing definition, which describes an "internal condition" of the debtor, he reasoned, could only be obtained by a comprehensive examination of the debtor's financial situation; the requirement of an act of bankruptcy was thus important in preventing the debtor's financial affairs from being pried into at will. The author therefore felt that insolvency would have to be redefined in terms of an inability to meet obligations as they became due-an "external condition," ascertainable without interference into the debtor's affairs-before the acts of bankruptcy could be eliminated. Id. at 211-12. See also Note, "Acts of Bankruptcy" in Perspective, 67 Harv.L.Rev. 500 (1954)