**NEUWIRTH INVESTMENT FUND, LTD., and Neuwirth International Fund, N. V., Plaintiffs,**

**v.**

**Norman F. SWANTON, as Liquidator for Dempsey-Tegeler & Co., Inc., et al., Defendants.**

**No. 72 Civ. 268.**

United States District Court, S. D. New York.

Nov. 17, 1975.

Lipper, Lowey & Dannenberg by Stephen Lowey, Richard B. Dannenberg, New York City, for plaintiffs.

Weil, Gotshal & Manges by Michael D. Hess, Dennis J. Block, Neal Schwarzfeld, New York City, for defendants Swanton and Dempsey-Tegeler.

Milbank, Tweed, Hadley & McCloy by Russell E. Brooks, Martha G. Bannerman, New York City, for defendant New York Stock Exchange, Inc.

MOTLEY, District Judge.

### OPINION ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs, two foreign investment companies, commenced this action on January 20, 1972, seeking rescission relief under Section 12(1) of the Securities Act of 1933 (15 U.S.C. § 77*l*(1)) ("Securities Act"). Their claim is that stock sold to them by defendants was not registered pursuant to Section 5 of the Securities Act (15 U.S.C. § 77*e*), and that, accordingly, they are entitled to redeliver the stock to defendants and have their money returned. On December 2, 1972, this court granted leave to plaintiffs to serve and file an amended complaint which added two additional counts based on theories of misrepresentation, alleging violations of Section 12(2) of the Securities Act (15 U.S.C. § 77*l*(2)) and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*j*(b)) together with SEC Rule 10b–5.

Plaintiffs have now moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment limited to count I of the Amended Complaint, seeking rescission relief under Section 12(1) of the Securities Act. Defendants in turn have cross-moved for summary judgment on this same count. Both sides maintain that there exists no genuine issue as to any material fact with regards to count I and that the question is ripe for summary judgment. This court concurs, and accordingly denies plaintiffs' motion for partial summary judgment as to the same count. While the material facts set out below are undisputed, the court has resolved any ambigui-

ties and has drawn all reasonable inferences in favor of the plaintiffs, against whom summary judgment is granted. *See Heyman v. Commerce and Industry Insurance Company,* 524 F.2d 1317 (2d Cir. 1975).

Thus, the following material facts, described in greater detail below, are found to be undisputed: 1) Defendant Dempsey-Tegeler ("Dempsey") acquired the involved shares, which were not registered for resale and which included a restrictive clause, as underwriting compensation and with the right to require registration of such shares by the issuer on demand. 2) The issuer of such shares never registered these shares, though asked to do so, and Dempsey continued to hold such shares in its investment account. 3) Dempsey eventually went into liquidation and a liquidator appointed by the New York Stock Exchange ("NYSE") took control of its assets. 4) Said liquidator attempted to have the shares registered or alternatively to have a no-action letter issued by the Securities and Exchange Commission ("SEC") regarding them, but failed on both counts. 5) Finally, the liquidator agreed to sell the restricted unregistered shares to plaintiffs with the understanding that defendants would exert their best efforts on the issuer to get the shares registered, and that plaintiffs did not intend to sell the shares until such registration. 6) Such registration never took place and plaintiffs continue to hold such shares. For purposes of this motion, this court also draws the inference that both defendants and plaintiffs sought registration of the involved shares with the intent of making a public offering of such shares after such registration. This is in accord with plaintiffs' contentions. This court also accepts for purposes of this motion plaintiffs' contention that the sale to plaintiffs involved two offerees rather than one.

*Statement of Facts*

The transaction which plaintiffs seek to have rescinded involved the sale to plaintiffs in January 1971 of an aggregate of 18,000 shares of the capital stock of a New York corporation known as American Bioculture, Inc. ("ABI"). Plaintiffs paid a total of $252,000 for the stock. At the time of sale, these shares were restricted unregistered shares from the investment account of the defendant Dempsey. They were not freely marketable, and the certificates for said shares bore the following legend:

"The shares represented by this certificate have been registered under the Securities Act of 1933 solely for sale to the holder of a Common Stock Purchase Warrant who may be deemed to be an underwriter of such shares within the provisions and for purposes only of the Securities Act of 1933. Unless the issuer of these shares agrees to a transfer of these shares, or any part thereof, any such transfer is null and void. The issuer will agree to such a transfer only if 1) a revised prospectus setting forth the terms of the offer has been filed as part of a post-effective amendment to the Registration Statement under which these shares are registered or as part of another Registration Statement and such post-effective amendment or other Registration Statement has become effective, or 2) it is reasonably satisfied that no such post-effective amendment or other registration is required."

Dempsey had been the holder of the Common Stock Purchase Warrant mentioned in this legend. It had been sold to Dempsey by ABI at the bargain price of $600 as additional underwriting compensation in connection with Dempsey's having acted as the principal and managing underwriter of a public offering of 140,600 shares of the capital stock of ABI under a Registration Statement filed with the SEC on September 17, 1968 and effective September 19, 1968.[1]

The warrant provided that the stock certificates issued to Dempsey upon exercise of

1. The arrangement was described on the cover page of the Prospectus filed as part of the Registration Statement:

"The Company has agreed to sell to Dempsey-Tegeler & Co., Inc. for 10¢ per share, non-transferable warrants, which expire five

the warrant would bear the restrictive legend quoted above,[2] and, in addition, provided in Section 7:

"The Company agrees that it shall be reasonably satisfied that no post-effective amendment or other registration is required for the public sale of shares to be issued pursuant to the exercise of the Warrant, if it shall be presented with a letter from the staff of the Securities and Exchange Commission (the "Commission") stating in effect that the staff will not recommend any action to the Commission if such shares are offered and sold without delivery of a prospectus, and that, therefore, no post-effective amendment to the Registration Statement under which such shares are registered or other registration statement is required by said staff to be filed.

"Upon written request of Dempsey-Tegeler & Co., Inc., the Company shall prepare and file with the Commission (as a post-effective amendment or amendments to the Registration Statement) such amended or supplemented prospectus or other documents, as may be necessary in the opinion of counsel for the Company and counsel for Dempsey-Tegeler & Co., Inc. in order to comply with the provisions of the Securities Act of 1933 so as to permit the public offering and sale of the shares acquired by exercise of the Warrant, in whole or in part."

Dempsey chose to exercise its Warrant on September 26, 1969, and received 18,000 shares of the capital stock of ABI at a total cost of $64,800. In December 1969, Dempsey requested ABI to file a Post-Effective Amendment to the Registration Statement effective September 19, 1968 for purposes of registering these 18,000 shares. The stock was then selling at approximately $36–$38 per share. In April 1970, a printer's proof of a proposed Post-Effective Amendment was prepared on behalf of ABI by its counsel, the New York law firm of Skadden, Arps, Slate, Meagher & Flom. However, this Amendment was never finalized or filed, and never became effective.

The 18,000 shares were still unregistered in August 1970, when, as a result of a period of severe financial difficulties, Dempsey was forced to cease business. Dempsey, for several years prior to this time, had been a member of the National Association of Securities Dealers and a member firm of the defendant New York Stock Exchange, Inc. ("NYSE"). Accordingly, on August 7, 1970, following Dempsey's cessation of business, the directors of Dempsey and the NYSE entered into an agreement whereby the NYSE, pursuant to Article XIX of its Constitution, agreed to make substantial payments from its "Special Trust Fund"[3] for the benefit of Dempsey and its customers, and wherein the directors of Dempsey authorized the NYSE to appoint a Liquidator for Dempsey to "take

---

years from the date of issue, to purchase 6,000 shares of Capital Stock of the Company. These warrants first become exercisable at an initial price of $10 per share twelve months after the date of their issue. Any profit realized by Dempsey-Tegeler & Co., Inc. upon the sale of the Capital Stock received as a result of the exercise of the warrants may be deemed to be, for purposes of the Securities Act of 1933, additional underwriting compensation."
It should be noted that while the warrant provided for the purchase of 6,000 shares, prior to its exercise ABI split its stock 3 for 1, with the result that 18,000 shares were delivered to Dempsey upon exercise of the warrant.

2. *See* p. 1189, *supra.*

3. The "Special Trust Fund" was created by the NYSE in 1964 to avoid brokerage firm bankruptcies. The Trustees of the fund are the

Governors of the NYSE. The principal of the trust consists of contributions made to it by the NYSE. Section 8 of Article X of the Constitution of the NYSE empowers the Governors of the NYSE to assess its members to reimburse the NYSE for payments made to the Trust Fund.

Section 1 of Article XIX provides that the funds from the trust are to:

"be used solely for the purpose of providing direct or indirect assistance to customers of a member, member firm or member corporation threatened with loss of their money or securities because such member, member firm or member corporation, in the opinion of the Trustees . . . is insolvent or in such financial condition that he or it may be unable without assistance to meet his or its obligation to such customers . . . ."

control of the business and property of Dempsey" and to exercise all powers of the corporation in liquidating its affairs.

On August 10, 1970, the NYSE appointed defendant Norman Swanton as Liquidator of Dempsey.[4] Swanton's duties were set forth in a letter dated August 24, 1970 from Robert M. Bishop, Vice President of the NYSE:

"This is to clarify your assignment as Liquidator of Dempsey-Tegeler & Co., Inc. Your duties and powers are spelled out in the Liquidation Agreement executed by the Directors of the corporation. The Exchange expects you to fulfill these responsibilities with efficiency and dispatch. In simple terms, you are the representative of the Special Trust Fund charged with the overall liquidation responsibilities. The firm personnel are all answerable to you, and your instructions to them are to be totally complied with. More specifically, your duties fall into the following four categories:

(1) to direct and supervise all expeditious steps to deliver out the remainder of the customer accounts,

(2) to husband the assets of the firm and of the Special Trust Fund,

(3) to pursue all feasible avenues to realize or recover receivables and possible claims of the corporation in order to increase its ability to meet its obligations to creditors. This includes possible claims against the Dempsey-Tegeler

partnership and present and former directors of the corporation,

(4) to maintain records to demonstrate your accountability and that of the Exchange in respect to this liquidation.

"In addition, you will need to make daily reports to the Exchange initially, which later may be changed to weekly, on the progress of the liquidation.

"You will report to Ray Lockhart, Chief Liquidator. During the immediate future, it may also be necessary for you to keep Mr. Arning informed by telephone of significant developments as they occur.

"As you know, the services of legal counsel to the Chief Liquidator have already been made available to you, and we are in the process of obtaining Los Angeles legal counsel to you. We will expect you to follow the advise of legal counsel on matters within their competence. We will also expect you to seek the advice and counsel of the officers of the Exchange on major decisions and policy matters, whether legal or not. . . ."

Among the duties of Swanton as Liquidator was to dispose of the restricted securities included in Dempsey's assets and to realize for them as much cash as possible.[5] Accordingly, on September 18, 1970, Swanton through counsel wrote to Robert E. Hopp, the president of ABI, advising that Swanton as Liquidator for Dempsey wished to sell the ABI shares and requested that a

---

**4.** Since, as will be seen, plaintiffs contend that the form of Dempsey's compensation is relevant to his possible classification as an "underwriter," it deserves description in detail.

Compensation for Swanton was fixed at the rate of $45,000 per annum, plus reimbursement for personal expenses up to a maximum of $750 per month, plus rental for a second household, the cost of transportation for himself between New York and Los Angeles, and the cost of similar transportation for his wife at the beginning and at the termination of his assignment as Liquidator for Dempsey. In addition to the foregoing compensation, the NYSE and Swanton agreed to a bonus system encouraging Swanton "to minimize expenditures by the Special Trust Fund." Since as of August 7, 1970, the NYSE contemplated that the Dempsey liquidation presented the Special Trust

Fund with a possible exposure of $29,000,000, the NYSE agreed to pay Swanton a bonus aggregating $40,000 if the cost of the Dempsey liquidation to the Special Trust Fund was less than $20,000,000.

**5.** Among these, in addition to the 18,000 unregistered shares of capital stock of ABI, were 556,800 "control" shares of common stock of King Resources Company; 2,640,000 unregistered shares of the common stock of Siboney Corp.; 102,246 unregistered shares of common stock of Data Mate Computer Systems, Inc.; 22,500 unregistered shares of Information Displays; unregistered warrants to purchase 25,000 shares of Golden West Mobile Homes; 125,000 unregistered warrants to purchase shares of Serendipity, Inc.; and 17,500 unregistered warrants to purchase shares of Image Systems, Inc.

post-effective amendment be filed. A response to this request was made by counsel for ABI, indicating that ABI would be favorably disposed to the sale of Dempsey's ABI shares without registration statement if counsel for Swanton would render an opinion "that no registration statement would be required in view of Dempsey's 'change of circumstance.'" The record does not indicate a response to this proposition, but on October 7, 1970 Swanton wrote to the SEC requesting a "no action" letter with respect to the 18,000 ABI shares "[i]n light of the radical change which has occurred."

On November 30, 1970, counsel to Swanton again wrote to Mr. Hopp on behalf of Swanton to request that a post-effective amendment to its registration statement be prepared by ABI and filed with the SEC as soon as possible "in order to permit the sale of such shares by the liquidator." Counsel commented upon the request for a no-action letter as follows:

> "To date we have not received a favorable reply to our 'no action' letter request and are not optimistic about receiving such a reply. Accordingly, we have no alternative but to request the prompt preparation and filing of a post-effective amendment to the subject registration statement."

Counsel correctly anticipated the SEC's response. On December 7, 1970, the chief counsel of the SEC's Division of Corporate Finance wrote to Swanton to inform him that the ". . . Division is unable to conclude that you would not be deemed to be an underwriter within the meaning of Section 2(11) of the [Securities] Act were you to publicly sell the shares at this time." Pursuant to this letter, counsel for Swanton wrote ABI's counsel on December 14, 1970, reiterating the request for the preparation and filing of a post-effective amendment to the relevant ABI registration statement.

This was the state of affairs as of January 1971 when the transaction at issue in the present action was consummated. At the time of the sale of the 18,000 shares to plaintiffs, the shares remained unregistered and plaintiffs represented to Swanton that they would not sell such shares without an effective registration under the Securities Act. Swanton in turn promised to use his "best efforts" to see that the shares were registered by June 30, 1971. To that end, he obtained from ABI an agreement to transfer to plaintiffs Dempsey's right to demand a post-effective amendment or new registration regarding the shares. By letter of January 26, 1971, counsel for ABI advised plaintiffs that ABI would use "its best efforts to cause such registration statement to become effective during the month of May, 1971." No such registration statement was ever filed and at the present time plaintiffs continue to hold the 18,000 shares.[6]

*Issues of Law*

While the fact pattern attendant to the instant motion and cross motion for summary judgment is fairly complex, both sides agree that the dispositive legal issue involved is a narrowly focused one. Section 12(1) of the Securities Act under which plaintiffs seek rescission provides that:

> "Any person who—
>
> (1) offers or sells a security in violation of section 5,
>
>   \*    \*    \*    \*    \*    \*
>
> shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." [15 U.S.C. § 77*l*(1)]

---

**6.** Plaintiffs originally paid $14 a share for the ABI stock in January 1971, when the market price of the stock was slightly over $20. When this action was commenced on January 20, 1972, ABI common stock was trading in the over-the-counter market in the $5 to $6 range. As of January 16, 1974, when the motion under consideration was filed, the bid price for ABI common stock was under 50¢ per share.

It is plaintiffs' contention that the sale by Swanton to plaintiffs of 18,000 shares of unregistered ABI stock, by use of the mails and telephone, violated Section 5 of the Securities Act.[7] Defendants concede that the 18,000 ABI shares issued to Dempsey upon the exercise of its warrant had been registered solely for sale by ABI to Dempsey, and were, by their terms, not registered for sale to anyone else. Thus, the undisputed facts in this case do constitute a *prima facie* case for a Section 5 violation and Section 12(1) remedy. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971);[8] III Loss, *Securities Regulation* 1693 (2d ed. 1961).

▉ Nor can defendants claim that plaintiffs' mere prior knowledge of the unregistered status of the purchased shares placed plaintiffs *in pari delicto* so as to render them incapable of pursuing a Section 12(1) remedy. The purpose of that section has generally been construed to be the discouragement of the sale of unregistered securities rather than a personal remedy requiring that the remedy-seeker be completely guiltless. *See American Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F.Supp. 1276, 1280 (S.D.N.Y.1972); *Rosenberg v. Hano*, 121 F.2d 818, 822 (3d Cir. 1941); *Henderson v. Hayden Stone, Inc.*, 461 F.2d 1069, 1072 (5th Cir. 1972); VI Loss, *Securities Regulation* 3828 (Supp. to 2d ed., 1969).

▉ However, in countering the *prima facie* case made out against them, defendants invoke Section 4 of the Securities Act, which "carefully exempts from [the Securities Act's] application certain types of . . . securities transactions where there is no practical need for its application or where the public benefits are too remote." H.R.Rep.No. 85, 73rd Cong., 2d Sess. 5 (1933). More specifically, defendants maintain that the sale of 18,000 shares of ABI common stock to plaintiffs was exempt under Section 4(1), which exempts "transactions by any person other than an issuer, underwriter, or dealer." (15 U.S.C. § 77d(1)). Both sides agree that the disposition of the motion and counter-motion presently before the court depends solely upon a decision as to the applicability or non-applicability of the 4(1) exemption in the instant case. Nor is there any dispute as to the proposition that the burden of proving that the securities are exempt from registration is upon defendants. *S. E. C. v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Gilligan, Will & Co. v. S. E. C.*, 267 F.2d 461 (2d Cir. 1959), cert. den., 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1960); S.E.C. Securities Act Release No. 4552, Nov. 6, 1962, 27 F.R. 11316, 17 CFR 231.4552, 1 CCH Fed.Sec.L. Rep. ¶ 2783.

The relevant issue of law may be narrowed even further at the outset. Plaintiffs concede that defendants were not "dealers," as defined under the Securities Act, so this element of the 4(1) exemption need not be considered by the court. As regards the status of defendants as "issuers," the situation is slightly more ambiguous. Initially, in their Memorandum of Law in Support of Motion for Summary Judgment on Count I, plaintiffs contended that it was "beyond dispute that ABI was the issuer of the securities involved in this

---

7. Section 5 of the Securities Act provides in pertinent part:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." [15 U.S.C. § 77e]

8. "In order to establish a *prima facie* case for a Section 5 violation, a plaintiff must prove three elements. First, it must be shown that no registration statement was in effect as to the securities. Second, it must be established that the defendant sold or offered to sell these securities, and finally, the use of interstate transportation or communication or of the mails in connection with the sale or offer of sale must be proved." 448 F.2d at 686.

case. . . ." [9] However, in their Reply Memorandum, plaintiffs change their position and make a perfunctory argument that Dempsey was an "issuer" as to the "integrated offering" of the various restricted securities contained in Dempsey's investment account which Swanton attempted to sell.[10] The court finds such an argument to be meretricious, and rejects it. The only authority cited by plaintiffs for this novel theory is *United States v. Rachal*, CCH Fed.Sec.L.Rep. ¶ 93,757 (5th Cir. 1973). It is difficult to perceive how that decision can be seen as in any way supportive of plaintiffs' theory, since it merely holds that officers and other controlling persons of an issuer may also be deemed to be an issuer for Section 4(1) purposes.

■ The term "issuer" is defined in Section 2(4) of the Securities Act as "every person who issues or proposes to issue any security." (15 U.S.C. § 77*b*(4)). Section 2(1) provides a number of definitions of the term "security." (15 U.S.C. § 77*b*(1)). Manifestly, none of these can be stretched to encompass Dempsey-Tegeler's investment portfolio, which consisted of a number of different securities. The case law under this section has consistently held that the term "security" means an investment in a common enterprise in which the investors are purchasing an interest and where the growth of that investment is to result from the efforts of the promoter. *See, e. g., Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

■ Here, on the other hand, Dempsey's portfolio of diverse securities had none of the attributes of a "security." The purchasers were not acquiring an interest in Dempsey and their investment was in no way dependent upon the actions of Dempsey for its success. Indeed, there is no common enterprise involved here at all.

Dempsey's investment portfolio consisted of various securities of diverse issuers. Purchasers of these securities had no further relationship with Dempsey after their purchase; they looked to the issuer of the specific security for the growth of their investment. Hence, plaintiffs' argument calling Dempsey's portfolio a "security" which Dempsey "issued" is specious.

This limits the relevant legal issue in the instant motions to a single consideration—namely, do any or all of the defendants come within the Security Act's definition of "underwriter" for purposes of denying them the Section 4(1) exemption from the registration requirements of Section 5? The term "underwriter" as used in the Securities Act is defined in Section 2(11) as follows:

"(11) The term 'underwriter' means *any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking*, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." (15 U.S.C. § 77*b*(11)) (Emphasis added.)

■ For all defendants to prevail, therefore, each must show that it did not participate in the "purchase" of the 18,000 shares of ABI stock "with a view to . . . the distribution" of them and that the sale to plaintiffs was not "in connection with the distribution" of ABI stock. The word "distribution," as used in Section 2(11) has been

---

**9.** Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment on Count I, at 36.

**10.** Plaintiffs' Reply Memorandum, at 23.

held to mean the equivalent of a "public offering," and therefore the determination whether one is an "underwriter" under Section 2(11) requires an analysis of the same considerations relevant to the determination of whether a transaction involves a "public offering" within the meaning of Section 4(2). *Gilligan, Will & Co. v. S.E.C., supra; The Value Line Fund, Inc. v. Marcus,* CCH Fed.Sec.L.Rep. ¶ 91,523 (S.D.N.Y. 1965).

■ In attempting to bring defendants within the definition of "underwriter," plaintiffs make the preliminary contention that Swanton himself may be deemed to have "purchased" the 18,000 ABI shares from Dempsey. To support this position, plaintiffs cite the Second Circuit's decision in *SEC v. Guild Films Co., Inc.,* 279 F.2d 485 (2d Cir. 1960), *cert. denied sub nom. Santa Monica Bank v. SEC,* 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960). In that case, the Santa Monica Bank held 50,000 shares of unregistered Guild Films stock as collateral for a loan. After the loan went into default, the bank foreclosed on the collateral and began a public sale of the shares notwithstanding their unregistered status. The court held that the bank was an "underwriter" in that case and had "purchased" the shares within the meaning of Section 2(11). That holding cannot be extended to the instant case. In *Guild Films,* the alleged purchaser was a lender and pledgee who foreclosed on the security collateralizing the loan, thereby acquiring an interest in the security. In the instant case, Swanton acquired nothing from ABI or from Dempsey; rather, he was merely the "liquidating agent." *Blair & Co., Inc. v. Foley,* 471 F.2d 178 (2d Cir. 1972) *remanded on other grounds,* 414 U.S. 212, 94 S.Ct. 405, 38 L.Ed.2d 422 (1973). Similarly, in *Guild Films,* unlike the instant case, the proceeds

of the sale would have inured to the direct benefit of the lender, whereas the proceeds of the sale of the ABI shares were received by Dempsey and its customers and not by Swanton. Plaintiffs make much of the fact that as a result of the sale the NYSE Special Trust Fund would ultimately suffer less exposure to financial loss and that Swanton might receive a bonus for limiting such exposure. Such benefits, however, remain too remote to cause the assumption of control by Swanton to be styled a "purchase" of the ABI shares, and this court refuses to so extend *Guild Films.* In addition, even if Swanton were deemed a purchaser, he would not come within the other elements of the Section 2(11) definition of "underwriter," as interpreted below by this court.

Hence, any exposure of Swanton to Section 12(1) liability rests upon his position as "liquidating agent" to Dempsey.[11] Therefore, the crucial issue which remains to be decided is whether Dempsey may be deemed to be an "underwriter" for purposes of determining the applicability of the Section 4(1) exemption.

■ The mere fact that Dempsey had previously underwritten an ABI public offering and that the shares at issue in this litigation were received as compensation for such underwriting is in no way dispositive of the issue. Congress made this clear in enacting the Securities Act:

"[T]here is a point of time when a person who has become an underwriter ceases to exercise any underwriting function and, therefore, ceases to be an underwriter. When that point is reached, such a person would be subject only to whatever [other] restrictions would be imposed upon him. . . . " H.R.Rep. No. 85, 73rd Cong., 2d Sess. 16 (1933).

11. Similarly, any liability under Section 12(1) on the part of the NYSE would also be derivative. Plaintiffs argue that the NYSE should be held liable as an underwriter in the event that either Dempsey or Swanton is found to be an underwriter. Two theories are advanced: 1) the NYSE's "participation" in any underwriting attributed to Swanton or Dempsey in this transaction; or 2) the fact that the NYSE here is a "controlling person" of Dempsey and Swanton. Without reaching the merits of either of these theories, the court notes that since neither Dempsey nor Swanton is found to be an "underwriter" in the instant case, no liability attaches to the NYSE.

This principle has been applied to cases identical in nature to the instant matter. Thus, the SEC has seen fit to issue a "no action" letter for the sale by a former underwriter of 13,390 shares of the underwritten company which were originally acquired as underwriting compensation. *See* "Brennard-Paige Letter" of May 4, 1973, Exhibit J to Block Affidavit. *See also Culpepper's Plantation Enterprises, Inc.,* CCH Fed.Sec. L.Rep. ¶ 78,112 (April 7, 1971). Similarly, the mere fact that the involved stock certificate itself bore the legend that the holder "may be deemed to be an underwriter of such shares within the provisions and for purposes only of the Securities Act of 1933" should not be dispositive. The regulative scheme of the Securities Act would fall into disarray if parties to transactions could themselves specify how or when the Act was to be applied.

Thus, two fundamental queries remain to be answered in order to determine whether or not Dempsey could be considered an underwriter in the transaction herein considered: 1) Did Dempsey purchase the ABI shares with "a view to" their "distribution"? and 2) Did the sale of these shares to plaintiffs itself constitute a "distribution"?

As noted earlier, the term "distribution" in this context has been construed to be the equivalent of "public offering."[12] However, this definition may be somewhat misleading, since the term "public offering," as used in the present context, does not encompass a *registered* public offering within its scope. The Second Circuit, for example, has defined the standard to be applied in judging whether an offering is "public" for Section 4(1) purposes in this manner:

"[T]he governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Gilligan, Will & Co., supra,* at 466, citing *SEC v. Ralston Purina Co.,* 346

U.S. 119, 125–27, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

In other words, a registered public offering would not be a "public offering" under these criteria, since, *a priori,* offerees and purchasers in a registered public offering have available to them "such information as a registration would have disclosed." Consistent with this view is SEC Rule 152, 17 C.F.R. § 231.152, interpreting Section 4(2) of the Securities Act, and providing that a later registration or registered public offering does not affect the non-public nature of the original sale.

Such a definition of "public offering," while on its face unconventional, is entirely consistent with the scheme of the Securities Act, which was promulgated to encourage the disclosure of relevant information concerning a stock issue by the registration procedure. It would indeed be anomalous, given this emphasis on registration and disclosure, if the Act afforded the Section 4(1) exemption to a party who purchased stock with no intention of making a registered sale, while denying such exemption to a party who had the best intentions of carrying out such a registered sale, though prevented from doing so by circumstances beyond his control.

This gloss on the term "distribution" is important for present purposes in two respects. First, it is relevant to determining whether Dempsey purchased the ABI shares with a view to distribution. Secondly, it must be applied in determining whether the sale by Dempsey to plaintiffs in its own right constituted a distribution in that plaintiffs themselves purchased with a view to distribution rather than investment. If either a view to distribution or an actual distribution can be shown, Dempsey must be considered an underwriter incapable of invoking the Section 4(1) exemption.

As regards the first consideration, this court holds that Dempsey did not purchase the ABI shares with a view to distribution. Dempsey may be considered to have purchased the shares at the time when

---

12. *See* p. 1194, *supra.*

it exercised its option on them in September 1969. *See* I Loss, *supra,* at 553. Plaintiffs' contention is that Dempsey's view to distribution is evident from the fact that Dempsey sought to have the shares registered for sale soon thereafter, in accordance with ABI's promises to register the stock upon demand. However, as noted above, the intent to register the shares or to sell them after registration is not sufficient to deprive defendants of the Section 4(1) exemption. Indeed, the fact that Dempsey acquired these shares with a legend restricting their transfer and held the right to require registration would seem to show that Dempsey had *no* intent to make an unregistered distribution.

Dempsey acquired the ABI stock on September 26, 1969, after the exercise of a warrant to purchase common stock which had been issued to it on September 6, 1968. These shares were held by Dempsey in its investment account and were recorded on its books as being restricted. No attempts were made to sell these shares until late 1970, when Dempsey went into liquidation. The sale to plaintiffs did not occur until January 1971. Thus, Dempsey held the stock until forced to dispose of it by a drastic change in its financial position. Dempsey's investment intent is clearly indicated by its continued holding of the stock over a period of time until it was forced by its liquidation to raise cash to pay its public customers and creditors and by the fact, as will be shown below, that it *never* made a distribution or public offering of the shares. These facts negate any inference that Dempsey's original acquisition of the ABI stock was made with a view to an unregistered distribution. In an analogous case, the SEC recognized that a sale of unregistered securities made for the purpose of avoiding personal bankruptcy was not inconsistent with the requisite investment intent as of the time when the stock was purchased. *American All-Servus Corporation,* CCH Fed.Sec.L.Rep. ¶ 78,086 (March 4, 1971).

The final determination to be made by this court in deciding the applicability of the Section 4(1) exemption concerns the question of whether or not Dempsey's sale of the ABI shares to plaintiffs constituted a distribution in its own right. As noted earlier, in determining whether a sale of securities was part of a distribution rendering the seller an underwriter, the courts have consistently applied the criteria and standards that have evolved under Section 4(2), the "private placement" exemption. *See, e. g., The Value Line Fund, Inc. v. Marcus, supra; Fuller v. Dilbert,* 244 F.Supp. 196 (S.D.N.Y.1965), *aff'd* 358 F.2d 305 (2d Cir. 1966). In *SEC v. Ralston Purina Co., supra,* the leading case on the meaning of a "public offering," the Supreme Court looked to the purpose of the Securities Act, which it declared was "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." 346 U.S. at 124, 73 S.Ct. at 984. Interpreting the "private offering" exemption in light of this statutory purpose, the Court expressed the view that a transaction is exempt when the particular class of offerees had "access to the same kind of information that the Act would make available in the form of a registration statement." 346 U.S. at 125–26, 73 S.Ct. at 985. The courts, in attempting to construe this concept, have described many factors as relevant to a determination of whether or not a particular transaction is a public offering. Several such factors, which will be considered *seriatim* in regards to the instant transaction are: the number of offerees, the offerees' access to relevant information and the purchaser's intent at the time of purchase.

In the instant case, there were at most two offerees. All negotiations for the transaction were handled by Henry Neuwirth, a director and advisor of both plaintiffs, and the terms of sale arranged were identical as to all shares, though they were billed to two entities, the Neuwirth Investment Fund and the Neuwirth International Fund. It is not even clear that Swanton knew that he was dealing with two entities, though for purposes of this motion we accept plaintiffs' contention *that he was.*

Only two other persons—Glenn Mayer and John Hecht—were even contacted regarding the fact that Dempsey's ABI holdings might be available for sale, and those approaches had none of the earmarks of an offer. Hecht was asked for advice on how to arrange a private sale and Mayer was asked for advice on how to locate a potential buyer; neither was approached as a potential purchaser or authorized to offer the stock to anyone else. Indeed, according to the deposition of Henry Neuwirth, even *he* did not learn of the existence of the 18,000 unregistered shares from Dempsey, but from the president of ABI. In the view taken by the Supreme Court in *Ralston Purina,* the number of offerees is not a dispositive factor in establishing a public offering. 346 U.S. at 125, 73 S.Ct. 981. But the holding in that case was only that a large number of offerees was not conclusive proof that there was a public offering. The Court was not faced with the question and did not decide if a small enough number of offerees might conclusively determine that a transaction was private. *See* I Loss, *supra,* at 661. Indeed, the Court quoted approvingly an English case stating that one offeree would not constitute "the public" unless "he is intended to be the first of a series of subscribers, but makes further proceedings needless by himself subscribing the whole." 346 U.S. at 125, 73 S.Ct. at 985 (n.11), *quoting Nash v. Lynde,* [1929] A.C. 158, 169. Such was not the case here; there is no showing that a series of transactions was contemplated or attempted. Besides, *Ralston Purina* notwithstanding, the courts have continued to refer to the number of offerees as a relevant factor in defining a public offering. *See, e. g., The Value Line Fund, Inc. v. Marcus, supra,* at p. 94,970; I Loss, *supra,* at 661–65.

As regards the plaintiffs' access to relevant information, here, as in the *Value Line* case,

> "the offerees possessed enough sophistication to demand, and enough leverage at the bargaining table to receive, all

information relevant to make a fully informed decision on whether or not to buy." CCH Fed.Sec.L.Rep. ¶ 91,523 at p. 94,970.

Plaintiffs were able to obtain all the information they desired directly from ABI, and were satisfied that they had obtained sufficient information before negotiating the purchase. Indeed, they had more information regarding ABI than did defendants. Swanton, unlike plaintiffs, never contacted the president of ABI to discuss financial matters, nor did he even correspond with ABI. Furthermore, plaintiffs were sophisticated and experienced investors with the expertise and financial acumen necessary for making investment analyses and decisions. In their own selling literature, plaintiffs assert that "Henry Neuwirth's success is based on thorough study of marketing and sales policy of the companies whose shares he intends to acquire for the portfolio. By investing in shares of [plaintiffs] . . . you have the opportunity to benefit from the success of professional and sophisticated management." [13]

Plaintiffs assert additionally that the information to which they had access was not accurate and complete. Even assuming such to be the case, a Section 12(1) action against the present defendants would not be the proper remedy for plaintiffs to seek; these defendants, who in no way are even claimed to have participated in such alleged deception, cannot be held liable. The test for a private offering is access to the type of information which would be available in a registration statement. As the Court in *Value Line* noted in rejecting a theory similar to that asserted by plaintiffs here:

> "The fact that [the equivalents of Neuwirth and his agents] failed in [their] plain duty to fend for the plaintiffs and make the thorough investigation [they] pretended to make, cannot be twisted into any valid claim that plaintiffs did not have access to information and were not in a position to fend for themselves." CCH Fed.Sec.L.Rep. ¶ 91,523 at p. 94,970.

**13.** Prospectus of Neuwirth Investment Fund, Ltd., pp. 1–2.

A final consideration is whether the sale to plaintiffs must be considered a distribution because plaintiffs themselves intended to distribute the shares, making the sale to them part of a larger scheme of distribution. The evidence clearly shows an intention by plaintiffs to have the shares registered by June 30, 1971, and indeed defendants promised their "best efforts" to attain that end. Yet, as has been shown, the fact that plaintiffs desired immediate registration and perhaps a registered sale thereafter does not mean that sale to them can be considered part of a distribution for purposes of the Section 4(1) exemption.[14] Rather, only an intent on their part to make an unregistered public offering would suffice. Here, plaintiffs concede that they agreed not to sell the ABI shares to the public without an effective registration, and they have not done so until this time.

Given these facts, the sale of ABI shares by Dempsey to plaintiffs cannot itself be considered a distribution for purposes of terming Dempsey an "underwriter" and depriving defendants of the Section 4(1) exemption.

Accordingly, this court grants defendants' motion for partial summary judgment on Count One of the complaint, holding that application of the Section 4(1) exemption saves defendants from Section 12(1) liability for failing to comply with the registration requirements of Section 5 of the Securities Act. Plaintiffs' motion for partial summary judgment on the same Count is denied.

---

14. *See* pp. 1195–1196, *supra.*